## SERGEANT v. GOLDSMITH DRY GOODS CO. et al.

(Court of Civil Appeals of Texas. Dallas. June 28, 1913. Rehearing Denied Oct. 18, 1913.)

**1. INSURANCE (§ 687*)—CONSTRUCTION OF CONTRACT—STATUS OF MEMBERS—PAPERS TO BE CONSIDERED.**

.While the plan of an unincorporated insurance association, as disclosed by the application for membership and the contract of insurance entered into by the members with each other, cannot affect third persons, yet in fixing the legal status of its members such plan may be examined to ascertain the nature of the association.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1824; Dec. Dig. § 687.*]

**2. INSURANCE (§ 687*)—MUTUAL BENEFIT INSURANCE—NATURE AND STATUS.**

Where the plan of an unincorporated insurance association provided that each member should make a cash deposit from which to pay losses, the unexpended portion to be returned to the member at the expiration of his policy, the expectation being that the members would thereby secure a cheaper insurance, while the plan contemplated mutual fire protection, it was also for mutual profit and advantage and not merely for benevolent, charitable, etc., purposes, though the plan contemplated the nonaccumulation of profits.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1824; Dec. Dig. § 687.*]

**3. INSURANCE (§ 694*)—MUTUAL BENEFIT INSURANCE—LIABILITY OF MEMBERS TO THIRD PERSONS.**

The members of an unincorporated insurance association, operating under a plan whereby members make a deposit from which to pay losses and the business is run by a manager, the object being cheaper insurance, are liable for any debts incurred during their period of membership, and any agreement between the members limiting their liability would no more affect third persons than a similar agreement in an ordinary partnership.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1834, 1835; Dec. Dig. § 694.*]

**4. INSURANCE (§ 694*)—MUTUAL BENEFIT INSURANCE—RIGHTS OF MEMBERS AS TO EACH OTHER.**

The rights and liabilities of the members of an unincorporated mutual benefit insurance association, as between themselves, are governed by the provisions of the application for insurance and the policy contract issued thereon.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1834, 1835; Dec. Dig. § 694.*]

**5. INSURANCE (§ 735*)—MUTUAL BENEFIT INSURANCE—CONSTRUCTION OF CONTRACT—LIABILITY OF MEMBERS FOR LOSSES—LLOYD'S INSURANCE.**

The members of an unincorporated mutual benefit insurance association, the losses of which are ordinarily paid from deposits made by the members, but the policies of which provide that the members agree to pay any loss in the proportion that the amount of their deposits bear to the total deposits, are liable upon such policies in that proportion; such plan being different from Lloyd's insurance, where policies are issued to third persons as well as members and losses are paid from a trust fund contributed by the members.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 735.*]

**6. INSURANCE (§ 694*)—MUTUAL BENEFIT INSURANCE—LIABILITY OF MEMBERS FOR LOSSES—CORPORATIONS AS MEMBERS.**

The liability of the members of an unincorporated mutual benefit insurance association for losses, under a plan whereby a manager was appointed to carry on the business, the losses being payable by the members, is based on the principle of agency, and a corporation cannot escape liability on the ground that it could not become a member of a partnership, for, while the liability is similar to the liability of partners, the arrangement did not constitute a copartnership.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1834, 1835; Dec. Dig. § 694.*]

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Suit by George Sergeant, as receiver of and trustee for creditors of the Commercial Underwriters, against the Goldsmith Dry Goods Company and others to charge the defendants, as members of the unincorporated association known as the Commercial Underwriters, with personal liability for its debts. From a judgment for defendants, plaintiff appeals. Reversed and remanded.

Meador & Davis, of Dallas, for appellant. Madden, Trulove & Kimbrough, of Amarillo, and Read & Lowrance and Spence, Knight, Baker & Harris, all of Dallas, for appellees.

RASBURY, J. This appeal grows out of a suit filed by George Sergeant, as receiver of the Commercial Underwriters, an unincorporated insurance association, and as trustee for a large number of parties asserting claims against said Commercial Underwriters. Some 1,300 persons, firms, and corporations were named as defendants in the court below, all of whom were alleged to be engaged in the fire insurance business among themselves under the assumed name of the Commercial Underwriters, but who were charged to be in law a partnership association and liable as such under the facts hereinafter related. Sergeant was appointed receiver by Hon. Kenneth Foree, judge of the Fourteenth district court of Dallas county, in a proceeding against the Commercial Underwriters had for that purpose. A master in chancery was also appointed, and all those bringing the suit had prior thereto presented their claims to the master in chancery who heard, considered, and allowed same against the Commercial Underwriters as such. Judge Foree, after hearing exceptions to the master's report, in like manner allowed the claims and entered judgment therefor

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

against said Commercial Underwriters. Thereupon, as we have said, this suit was filed against the individual members of the association. Service of citation was had only upon Goldsmith Dry Goods Company, Strickland Furniture Company, Mistrot-Munn Company, Schwartz & Co., King Lumber Company, J. M. Radford Grocery Company, Panhandle Lumber Company, the Matthews Company, Boatman Hardware Company, and Rodgers-Wade Furniture Company. Before trial the receiver dismissed the suit as to all other defendants not served. Upon trial the above-named parties, defendants in the court below, urged a general demurrer to the sufficiency of the petition of the receiver seeking to hold them responsible as partners for the claims enumerated. The general demurrer was sustained. The receiver declined to amend and judgment was entered for said parties. From that judgment the receiver has appealed.

The facts alleged by appellant, and which the trial court held, if true, constituted no liability on the part of appellees, are in substance as follows: Prior to the filing of the instant suit George Sergeant was appointed receiver of the Commercial Underwriters, an unincorporated insurance association, by Judge Kenneth Foree of the district court of Dallas county and duly qualified as such. When Sergeant was appointed, the association was and still is insolvent, having no money on hand with which to pay its debts, except about $1,000, collected by Sergeant after his appointment. As receiver and trustee he filed this suit against a large number of individuals, firms, and corporations, seeking to hold them liable for the debts of the association, all of whom were members of the association at the time the debts were incurred. He dismissed his case against those who were not served before announcing ready for trial. The Commercial Underwriters was the name assumed by and under which the appellees and all other persons, firms, and corporations accepting a policy of fire insurance issued by the association operated a plan of co-operative or mutual fire insurance for insuring themselves against loss or damage by fire. Just how the initial start in business was made does not appear from the petition, but it does appear that, at the time of the transactions set out in the petition, the plan was in actual operation and the business of the association being actively conducted. As bearing upon the rights and liabilities of the members of the association or those holding policies in the association, the plan was to make application to the manager for insurance; and, before a policy or contract for insurance was issued, the applicant was required to sign and present to the manager of the association the following written application, to wit:

"The Commercial Underwriters at the In-surance Exchange, San Antonio, Texas. Advisory Committee: A. G. Castanola. J. C. Tips. Franz Groos. Application and Agreement for Insurance. Application of Herman and Schlok at the Commercial Underwriters, subject to the approval of the advisory committee, and upon the following plan here agreed to for maintaining an office where policies of fire insurance may be underwritten for the firms, corporations, or individuals herein called subscribers:

"(1) The business shall be under the supervision of a committee of subscribers elected annually, who shall monthly scrutinize all new or proposed subscribers; requesting the rejection of any who, in their opinion, are not up to the required standard acceptable at this exchange; who shall nominate one or more banks as trustee for receiving all funds paid by subscribers; who shall have direct supervision of these funds and of all expenses; who shall appoint an auditor to annually or oftener examine subscribers' accounts; and who shall adopt such proper regulations as they deem necessary—which shall not, however, conflict with the stipulations herein.

"(2) The manager's duties shall be to underwrite for the subscribers in his own name as manager policies of insurance against loss or damage by fire or lightning; to reinsure same; to make cancellations and changes in the amounts and conditions of same; to collect all sums due from subscribers by virtue thereof; to adjust and settle any loss; and to perform such other acts in relation to such policies as the subscribers could themselves do.

"(3) Each policy will be written under a similar form and at the same rate as required by stock insurance companies, but in lieu of the customary premium stated in each policy, each subscriber will make a cash deposit in proportion to said premium and in accordance with the experience of the exchange, and for this amount he shall be given credit. The sum named as each subscriber's premium shall gauge his interest in the business in that an amount not exceeding under any policy such premium shall be underwritten severally for each subscriber.

"(4) Such portion of a subscriber's deposit as shall not have been expended or be payable for losses or expenses shall be refunded to him upon the expiration of his policy or its termination, provided that where a policy is renewed, and the subscriber is not maintaining a reserve equal to one-half of his premium, that part unexpended may be retained for reserve, but to his individual credit, subject to return to him when he has ceased to be a policy holder.

"(5) The manager's remuneration for the services and such clerical force as he may require shall be 15 per cent. of subscriber's premiums. The committee is here authorized to charge an equitable amount against

each subscriber's account until all payments made toward establishing this exchange and which the committee has approved have been repaid.

"(6) If at any time or times a subscriber's deposit or deposits under policies in force shall be expended or an additional deposit be deemed necessary or expedient by the committee, then it shall be the duty of said subscriber to pay to the trustee such sums as may be required; provided said sum shall in no case exceed the amount of the premiums on his policy or policies then in force. If a subscriber shall fail to make a deposit within five days following receipt of notice by registered mail, all policies held by that subscriber shall thereafter be void.

"(7) Each policy issued shall be subject to cancellation by the assured or by the manager upon five days' notice, and the unexpended portion of the premium deposit shall thereupon be refunded to the subscriber, together with his portion of any surplus or reserve in trustee's hands.

"(8) The manager may commence and prosecute any proceeding at law in connection with any policy issued by him which he may deem proper and may compromise, settle or withdraw the same, also may appear for the subscribers in case of any proceedings at law being taken against them in connection with any policy, and in their name defend, compromise or settle same.

"(9) The undersigned hereby appoints C. W. Cannon of San Antonio, Texas, to act as manager herein referred to, and the manager may select and deputize some other person, approved by the committee, to exercise the same powers as held hereunder by him, and who, in the event of the decease or disability of the manager, shall assume that title.

"(10) The committee, who shall act for the undersigned as above provided, during each calendar year, shall consist of three or more subscribers (or members of firms or corporations who are subscribers) who shall be selected by a majority of the subscribers responding in writing to a notification, which the manager shall send to all subscribers on the 10th day of December, vacancies from any cause may be filled by a vote of the remaining members.

"Nothing herein shall be construed to obligate in any manner the subscriber hereto, until he shall elect to become a policy holder and thereafter only while holding a policy."

The policy issued upon the foregoing application contained the provisions and conditions usually found in standard fire insurance policies and in addition the following:

"This contract and agreement by and between the persons, firms, and corporations known as the Commercial Underwriters, being subscribers at the Insurer's Exchange (each acting through their duly appointed and accredited attorney in fact, C. W. Cannon,

known as 'Manager for the Commercial Underwriters') and hereinafter nominated the 'Exchange,' parties of the first part, and Hollon & Pratt, Klondike, Texas, hereinafter nominated 'holder of this contract,' party of the second part, witnesseth:

"In consideration of the stipulations herein named, and upon the terms and conditions herein expressed, and in further consideration of a deposit of one hundred, forty and no/100 dollars, and in the making in advance to the Commercial Underwriters at Insurer's Exchange in the city of San Antonio, Texas, of a similar deposit upon the first day of March in every year during the continuance of this contract, the parties of the first part do severally, each for himself or itself, and not jointly, no one being bound for any other, hereby guarantee to indemnify the said Hollon & Pratt, party of the second part, from the first day of March, 1910, at noon, against all direct loss or damage by fire, except as hereinafter provided, to an amount not exceeding four thousand dollars, to the following described property while located and contained as described herein, and not elsewhere, to wit: * * * .

"By the word 'exchange,' as the same is used in this contract, is meant and the same shall be held to mean the persons, firms and corporations who, at the time of loss or damage accruing hereunder, are subscribers at the Insurers' Exchange to the Commercial Underwriters, and the intent of such subscribers in signing this policy, through their attorney in fact, is and shall always be taken and held to be for the purpose of binding to the covenants, terms and conditions hereof, each and every person, firm and corporation, which is a subscriber, and none but those which are subscribers when loss or damage accrues under this contract, and the responsibility of each subscriber is in the same proportion to the entire loss or damage hereunder, which such subscriber's deposit or deposits, at the time of such loss or damage, bear to the aggregate of all deposits then in force. The subscribers are all those, and only those, who have accepted contracts of indemnity against loss or damage by fire, issued by this exchange, and whose contracts are then in force.

"To avoid a multiplicity of suits, all suits, or other proceedings at law or in equity shall be begun and maintained for the recovery of any claim upon, under or by virtue of this contract against the manager of the Commercial Underwriters in the court, which is the highest court of original jurisdiction; and a final decision in such suit or other proceedings shall be taken to be decisive of the similar claim, so far as the same may subsist, against each of the other subscribers at interest, absolutely fixing the liability in the premises; each of the subscribers in consideration of this entire stipulation, so far as he individually is or may be concerned, ex-

pressly agrees to accept and abide by the result of such final decision, in the manner and to the same effect as if he had been defendant in a similar suit or other proceeding as to the similar claim against him, so far as the same may subsist, save and except, however, as to the matter of costs and disbursements. And the manager is hereby authorized as to each subscriber to receive and admit service of process in any suit or other proceeding begun or maintained as aforesaid."

The claims allowed by the master in chancery and sued upon in the court below can be divided into three classes; the first being for debts due by the association to third persons incurred in conducting and maintaining the business, the second being debt due C. W. Cannon for compensation due him under contract, and the third being for the losses under their policies by members of the association.

Appellant's first assignment of error challenges the correctness of the action of the court below in sustaining appellees' general demurrer and asserts thereunder the proposition that the individuals, firms, and corporations holding membership in the association known as the Commercial Underwriters are liable as general partners for all the claims sued for by appellees. This proposition presents for review the relation of the members of the association to one another, their rights and liabilities in that respect, as well as the rights and liabilities of the members of the association to third persons. Inasmuch as the application for membership in the association and the policy issued by the association to each member herein referred to must to a great extent, if not wholly, control the relations between the various members of the association, it is obvious that the liability of the members to third persons is controlled by another and different rule of law. Hence it becomes necessary, in order to determine the liability of the members to outsiders, to also ascertain what character of association appellees were members of, since that question to an extent affects their liability to such third persons.

[1] While the plan of the association as disclosed by the application for membership and the contract of insurance entered into by the members with each other cannot affect third persons, yet, in fixing the legal status of the members of the association, such plan may be looked to for the purpose of ascertaining what manner of concern the association is, whether for mutual benefit and profit, as claimed by appellant, or whether for social, benevolent, charitable, or mutual fire protection, as claimed by appellees.

[2] After careful consideration of the plan of the association as shown by the application and policy, we have concluded that, while the purpose of the association may have been for mutual fire protection, it was as much also for mutual profit and advantage. In short, to secure for its members fire insurance on the mutual plan at less than the then prevailing or stock company rates. Such purpose is indicated by section 3 of the application for membership and insurance wherein it is provided that the rate to be paid for insurance in the association shall be the same rate charged by stock insurance companies, but that, instead of paying such premiums, the person, firm, or corporation seeking membership and insurance in the association shall make a cash deposit, and the amount of the cash deposit is required to be only that proportion of the premium charged that the experience of the association shows will be necessary to meet the anticipated liabilities of the association under the policies issued. But that it was the understanding and the expectation of the members that their insurance would be secured at a rate less than the rate then prevailing among stock companies, and in proof of the fact that the members did pay less than the prevailing rate, is disclosed by section 6 of the application which provides that, if the sum deposited by the member shall have been expended presumably in payment of losses to other members, then an additional payment may be demanded of members, provided such additional payment shall not exceed the amount of premiums fixed by this policy. Such understanding is further evidenced by section 4 of the application, which provides for a return to the member upon the expiration of his policy of the unexpended portion of his cash deposit. As further disclosing the purpose of the association, the application and the policy issued to the members of the association show that membership commenced with the issuance of the policy and terminated with its expiration, and that any and every one approved by the committee of subscribers named in clause 1 of the application for membership was eligible to membership upon payment of the cash deposit already referred to, thus evidencing, beyond intelligent dispute, the organization and maintenance of an association having for its purpose the issuance of fire insurance policies to its membership and the payment of losses thereunder. The fact that the plan of the association comprehended the nonaccumulation of profits made the association none the less one engaged in affairs of business, since the saving of the profits of the ordinary stock insurance companies by insuring the property of the members at a less rate is but another method of profiting by the association and evidences a business totally unlike voluntary unincorporated associations having for their purpose charity, benevolence, or pleasure.

[3] These observations are made, of course, in reference to the liability of the members of the association to third persons, for, as to third persons, we think "each member

* * * is liable for the debts thereof incurred during his period of membership and which have been necessarily contracted for the purpose of carrying out the objects for which the association was formed." 4 Cyc. 310. While it is true that most of the adjudicated cases dealing with the liability of individual members of associations have reference to unincorporated joint-stock companies in which the members of the association hold either stock certificates or other evidence of his interest in the association and in which the concern dealt more generally with the public than in the instant case, as, if for example, the Commercial Underwriters had insured the public against loss by fire without limitation on its liability, nevertheless we can see no real distinction as to the liability of members of such associations and the one in the instant case to third and noninsuring persons for debts incurred by the association in conducting its business. Any intended or, for that matter, express limitation among the members of their individual liability could no more control the rights of third persons than could a similar agreement between the members of an ordinary partnership. Members of such associations must know that liability of no small extent to third persons will be incurred, and to say that such associations may be permitted to distribute the ordinary profits of a fire insurance concern among themselves in cheapened rates and yet not be liable for the debts incurred in that behalf is to do violence to well-settled rules of law and equity. The members of the association are individually liable because they are all principals and, being principals, are bound in the same manner and for the same reason that members of an ordinary partnership are bound. Lewis v. Tilton, 64 Iowa, 220, 19 N. W. 911, 52 Am. Rep. 436.

The case nearest in point cited by appellant is Davison et al. v. Holden et al., 55 Conn. 103, 10 Atl. 515, 3 Am. St. Rep. 40. A number of individuals, as disclosed by that case, under the assumed name of the Bridgeport Co-Operative Association, conducted a business for the purpose of furnishing meat to its members and others at cost price. It was not intended by the members of the association to realize, nor did the business in fact result in, profit to them other than enabling them to dispense with the middleman; members paying for meat at the market in the usual manner. Officers elected by the members supervised the business. The amount of membership subscriptions was unknown, except that such subscriptions were from 5 cents to $5. Nor did it appear that the members assumed any liability for the debts of the association or that credit was extended to same on account of such membership. Creditors who had furnished supplies to the association sued certain members of the association, and in holding them bound for the debt the court say: "It did not otherwise appear than from the above facts that any of the members of the association ever held themselves out as partners or as being liable as individuals for the obligations of the association, or that the plaintiffs or any other persons ever gave credit to them, either as individuals or as partners, or that the members entered into any agreement of copartnership among themselves or into any agreement or understanding by which they or any of them should become personally liable for the debts of the association. The defendants claimed that they were not liable either as individuals or as copartners. The determination of the controversy as to the liability of the defendants depends not at all upon the question whether they and the other associated individuals were partners as between themselves, nor upon the question whether, as between all of the associates and strangers, they were such, but upon the law of agency. If the defendants clothed an agent with unrestricted authority to buy, they must pay, regardless of the other questions. Upon the record the defendants, with others undisclosed, associated themselves, for commercial purposes, for their pecuniary advantage. For convenience they transacted business under an assumed associate name, sent their managers and agents into the market with unrestricted authority to buy goods and pledge their credit under that name, to buy for the benefit of all jointly and of each individually. In the due execution of the authority conferred upon them they contracted the debt in suit and pledged the joint and several credit of the associates. As a matter of law, the plaintiffs, in giving credit to the associate name, gave credit to the individuals whom upon inquiry should be found to stand behind it. It is of no legal significance that the defendants did not intend to be individually responsible, or that they did not know or believe that as a matter of law they would be, or that they intended that the goods when bought should become the property of the association. Having given to the agent unrestricted authority to buy, their secret intent as to the ultimate destination of the merchandise is of no avail. The rule that he who instructs his agent to buy can be made to pay stands quite independent of intent or knowledge. He who buys by an agent buys by himself, and the law imputes to him knowledge that he must pay and the corresponding intent to pay for what he buys."

It is proper here to call attention to the similarity in the purposes of the plan of insurance in the instant case and that of the plan of conducting the store for the members in the case just cited. In the instant case the purposes of the plan and the benefit to be received by the members was cheapened insurance, while in the case cited the purpose of the plan and the benefit to be received was cheapened meat. The single point of

difference, if it is a difference, was that in the cited case any one could buy the meat, while in the instant case only those approved by the committee could secure insurance. A similar holding will be found in Hodgson et al. v. Baldwin et al., 65 Ill. 532, while the doctrine is in effect supported in Lumber Co. v. Texas Pine Land Association, 31 Tex. Civ. App. 375, 72 S. W. 875.

In view of what we have said, it follows that we are of opinion that the members of said association are individually liable for the debts incurred by their manager and others in conducting and maintaining the business of the Commercial Underwriters during their membership, and that the court below erred in sustaining the general demurrer in that respect.

[4] As indicated at another place in this opinion, we conclude that the rights and liabilities of the members of the association among themselves are to be determined and controlled by the provisions of the application for insurance and the policy contract issued thereon. Accordingly the rule of law that holds the members individually liable to third persons has no application to demands growing out of losses under policies of insurance, as maintained by appellant.

[5] The contract of insurance between the members, and it must always be kept in mind that the purpose of the association was for insuring members only, consists of the application and policy; the salient and controlling parts being those copied herein. Section 3 of the application, as we have said, provides for the cash deposit we have hereinbefore referred to and expressly declares that 'each member individually underwrites the policy losses only to the extent of his deposit or premium. Section 6 of the application provides in effect that the difference between the cash deposit and the stated premium may be collected from each member when the association's funds are insufficient to pay losses. Nowhere in the application, it will be noticed, is any attempt made to fix individual liability in the event the original cash deposit and the subsequent authorized assessment is insufficient to meet all losses or there is a total lack of funds to pay such losses. In the policy contract, however, there are certain provisions that do fix the ultimate rights and liabilities of the members. These provisions, as we have said, are the stipulations added by the association to those usually contained in the standard stock company insurance policies. At the inception of the contract it is recited that, in consideration of the payment of the premium demanded, each member of the association in issuing the policy under the authority of their authorized attorney in fact "do severally, each for himself or itself, and not jointly, no one being bound for any other," agree to indemnify the member holding such policy against loss or damage by fire, etc., to the amount named in such policy. This appears to be an outright unqualified obligation by every member to pay the loss. For the evident purpose, however, of limiting such apparent unqualified liability, the succeeding stipulation contains the provision that "the responsibility of each subscriber is in the same proportion to the entire loss or damage hereunder which each subscriber's deposit or deposits at the time of such loss bear to the aggregate of all deposits then in force." By these provisions, taken from both the application and policy contract, the liability of the members is to be measured, and to the extent of such liability each is necessarily an insurer during his membership for all policy holding members during their stay in the association. Appellees contend that there is no liability of the members to one another for the reason that the policies issued by the association were Lloyd policies. To the extent that the policies fixed the measure of each member's individual liability, the similarity ends.

Lloyd's insurance, so named because the scheme originated among the habitués of Lloyd's coffee house in London (25 Cyc. 1524), was insurance based upon a fund made up of deposits by each member of the association, and from which fund in case of loss the means of payment was taken. Those writing Lloyd's insurance were not, as in the instant case, organized for the single purpose of insuring themselves but third persons. Under the Lloyd's method each member contributes a portion of a trust fund to pay losses and accepts from the insurer his premium against the chance of loss on the policy of insurance. The members of the Commercial Underwriters created no fund other than any that might result from the premiums paid in and, in lieu of the trust fund contemplated by the ordinary Lloyd's policy, fixed the liability of each member by the clause quoted, In short, in lieu of the trust fund, which is the dominating feature of Lloyd's insurance, the members agreed to pay upon every loss that portion thereof that their cash deposits bear to all cash deposits in force at the time of any loss. Literally, if any given member had paid in 10 per cent. of all cash deposits in force at the time of any given loss, he would in like manner be compelled to pay 10 per cent. of the loss represented by such policy. By the Lloyd's method each member's liability would be determined by dividing the total amount of the policy by the number of underwriters forming the association or by taking from the general fund the proportion thereof contributed by each member. The language of the clause which we have quoted is plain and unambiguous, and we fail to see how it can intelligently be urged that it did not intend to indicate personal liability. Particularly is this true when it is considered that the single purpose of the association was to secure cheapened insurance, first, by paying in less than the fixed and agreed premium, second, by paying in balance of premium only when original

159 S.W.—66

payment was insufficient, and, third, by dispensing with the usual trust or reserve fund in such concerns and substituting therefor a limited and fixed personal liability. We think the intention to do so, as evidenced by the application and policy contract, is clear; clear enough at least that such intention follows as matter of law. Accordingly we hold that each member holding a policy of insurance in the association at the time of loss under any such policy was bound individually in the ratio or proportion indicated by the clause quoted.

[6] Appellees assert that corporations cannot become copartners with other corporations nor with individuals, and that, since the receiver's petition alleged such a copartnership, the demurrer was properly sustained. The allegations of fact set out in the receiver's petition did not, as to third persons or among themselves, constitute a copartnership, and the fact that the petition denominated the association a copartnership is immaterial. In the first subdivision of this opinion we hold that the members of the association as to third persons are bound as partners would be bound, not that they were members of a copartnership. As said in Davison v. Holden, supra, appellees' liability depends not at all upon whether they are partners between themselves or as to third persons but upon the law of agency. Hence we think the rule of ultra vires has no application.

What we have said in effect disposes of all the issues in the case, and for the reasons indicated the judgment is reversed, and the cause remanded.