OIL LEASE & ROYALTY SYNDICATE et al.
v. BEELER et al. (No. S284.)

(Court of Civil Appeals of Texas. Dallas. Jan. 3, 1920. Rehearing Denied Feb. 7, 1920.)

1. ASSOCIATIONS ⬦16—MEMBERS OF ASSOCIATION HAVE THE LEGAL LIABILITIES OF PARTNERS.

Parties constituting members of a voluntary association, as a syndicate, have the legal liabilities, rights, and duties of partners, except there ordinarily is no delictus personæ, and the affairs are usually conducted by managers designated according to the by-laws, and as the rights of each member are fixed by certificate, the death of a member will not dissolve the association.

2. PARTNERSHIP ⬦79—RIGHT OF MAJORITY OF PARTNERS TO CONTROL MAY BE CHANGED BY BY-LAWS.

While ordinarily the majority of the partners will control, the management of the business may by agreement be committed to one or more of the partners.

3. ASSOCIATIONS ⬦18—UNDER BY-LAWS DIRECTORS OF AN ASSOCIATION CHOSEN BY STOCKHOLDERS SUPERSEDE EXECUTIVE COMMITTEE..

The by-laws of a syndicate formed to buy and sell oil leases provided for an executive committee, which should perform all acts necessary to complete the organization, and further provided for the election of a board of directors by the stockholders, and that such directors should assume control of the business. Held, that, despite conflicting provisions in the bylaws, which apparently would have given the executive committee continuing control, the directors elected by the stockholders are thereafter entitled to control the affairs of the association as against the executive committee.

4. APPEAL AND ERROR ⬦1024(2)—CONCLUSIONS OF TRIAL COURT SUPPORTED BY EVIDENCE WILL NOT BE DISTURBED.

A finding of fact by the trial court, which granted a temporary injunction, when supported by evidence, will not be disturbed on appeal.

5. INJUNCTION ⬦136(2) — ENFORCEMENT OF CONTRACT MADE BETWEEN EXECUTIVE COMMITTEE OF A SYNDICATE AND CORPORATION WHICH COMMITTEEMEN CONTROLLED WILL BE TEMPORARILY ENJOINED.

Where the executive committee of a syndicate formed to acquire oil leases entered into a contract with a corporation, which the members of the committee controlled, enforcement of such contract will be temporarily enjoined, in a controversy between directors subsequently elected by the stockholders and the executive committee; all the parties being before the

⬦For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

court, and it being the purpose of the executive committee to enforce the contract, unless temporarily enjoined.

**6. INJUNCTION ☞157 — INTERLOCUTORY DECREE NOT OBJECTIONABLE BECAUSE GRANTING ALL RELIEF PRAYED.**

An interlocutory injunction is not open to attack because it granted all the relief prayed for.

**7. JURY ☞13(12) — ISSUES OF FACT IN INJUNCTION SUITS TO BE TRIED BY JURY IF DEMANDED.**

In a suit where relief by way of injunction is sought, the parties are entitled to jury trial on disputed fact issues, on regular assignment of the case, if demanded.

**8. INJUNCTION ☞148(1)—BOND FOR TEMPORARY INJUNCTION MAY BE FILED IN APPELLATE COURT.**

Where an interlocutory injunction was granted without the filing of the bond required by Vernon's Sayles' Ann. Civ. St. 1914, art. 4654, the injunction may be upheld after appeal by the filing of a bond in the amount fixed by the Court of Civil Appeals.

Appeal from District Court, Dallas County; W. F. Whitehurst, Judge.

Suit by the Oil Lease & Royalty Syndicate and others against H. B. Beeler and others, who cross-complained. From an interlocutory judgment in favor of defendants, plaintiffs appeal. Affirmed conditionally.

Adams & Stennis, of Dallas, for appellants. Thompson, Knight, Baker & Harris, of Dallas, for appellees.

RASBURY, J. On January 7, 1919, W. E. Shuttles, E. H. Shackelford, H. B. Beeler, Werth Wimberly, and J. W. Crotty signed and acknowledged, in the manner required for acknowledging deeds, an instrument in writing for the purpose of forming a voluntary association, to be known as the Oil Lease & Royalty Syndicate, the purpose of which was to accumulate money and property and to buy and sell oil leases and oil and mineral royalties. The amount of money to be accumulated was in no event to exceed $250,000, and those contributing the money were to receive certificates of shares covering the amount contributed, each of the face value of $25, issued by the officers designated in the articles of association. The parties agreed that an "executive committee," composed of "five certificate holders," should manage the affairs of the association, and should have authority during its existence to perform all acts in its judgment necessary to complete the organization, and, after organization, to make or enter into all contracts or agreements necessary or advisable, in its judgment, for the conduct of the affairs of the association, to invest its funds, and to direct and manage all of its affairs.

It was also agreed by the five parties that they should constitute the executive committee, and should hold their office as executive committeemen "until called together for the purpose of electing trustees to take over the accumulated assets and create a declaration of trust or corporate body. * * *" It was further agreed that there should be a board of five directors, which should act in an advisory capacity to the executive committee, but that after the "dissolution" of the executive committee a board of directors selected by the shareholders should have charge of the conduct and management of the affairs of the association. The profits, after deducting all expenses of operation, commissions, etc., were to be paid to shareholders in good standing upon the order of the executive committee as dividends. Other provisions, attempting to fix the liability of shareholders as to third persons, etc., are contained in the agreement, but are omitted here, because of no controlling importance in the decision of the issues presented.

Prior to or concurrently with the execution of the articles of association the parties named therein as the executive committee, Shuttles, Shackelford, Beeler, Wimberly, and Crotty, organized and secured from the state authorities a charter for the Oil Lease & Development Company, naming themselves as its board of directors, with an authorized capital stock of $700,000, all of which was acquired by them and one Tucker, a geologist. On January 7, 1919, the association, Oil Lease & Royalty Syndicate, and the corporation, the Oil Lease & Development Company, entered into a contract in writing by which, after reciting that the Development Company was possessed of valuable geological information regarding the location of oil and gas leases within the state, and possessed as well of certain exclusive sales contracts covering oil and gas leases in Erath and Comanche counties, the Development Company agreed to transfer and assign to the Syndicate all its right, title, and interest in and to the enumerated lease contracts, and to furnish the Syndicate such geological information regarding the oil-bearing territories of the state possessed by it, together with the exclusive option of purchasing all oil leases and royalties acquired by the Development Company upon the terms mutually agreed upon between the parties. In consideration of the doing of the things enumerated by the Development Company, the Syndicate agreed to pay the Development Company an amount equal to one-half its net earnings, first deducting all legitimate expense incurred in the operation and conduct of the business of the Syndicate.

Subsequent to the foregoing there were several meetings of the executive commit-

tee; the proceedings being recorded in a minute book. At such a meeting on February 7, 1919, Beeler was elected chairman of the executive committee and president of the board of directors, Crotty, Wimberly, and Shackelford vice presidents, and Shuttles secretary and treasurer. At the same meeting it was voted "that all salaries start on February 1st, $300 per month, payable last day of each month." The minutes fail to show to whom the salaries of $300 per month were to be paid, but the evidence shows without contradiction that they were intended for each member of the executive committee. On March 25, 1919, it was voted that one share of stock be issued to each of the executive committee. On April 29, 1919, there was held what purported to be a meeting of the stockholders of the Oil Lease & Royalty Syndicate. There were present at the meeting, according to the minutes recorded at that time, 18 stockholders in person and 103 by proxy. H. B. Beeler, E. L. Maxey, H. J. Castleberg, Miss Sue Adams, Henry Bell, C. W. Swisher, J. H. Foster, L. E. Warner, and W. E. Shuttles, all shareholders, were elected directors of the association. The call for the meeting was issued by Beeler, chairman of the executive committee. The authority for doing so is in dispute; some testimony tending to show that a majority of the executive committee directed it, and some tending to show the call was issued upon the demand of a minority of the executive committee. All members of the executive committee were cognizant of the call and the proposed meeting.

On April 30, 1919, the Oil Lease & Royalty Syndicate, the Oil Lease & Development Company, J. W. Crotty, Werth Wimberly, and E. H. Shackelford, the appellants, applied for and secured a temporary injunction enjoining Beeler, Shuttles, Castleberg, Foster, Warner, Maxey, and Sue Adams from interfering with a proposed sale by appellants of an oil and gas lease to R. O. Harvey, and from interfering with the management of the affairs of the Oil Lease & Royalty Syndicate as conducted by its executive committee. Subsequently, on the coming in of motion to dissolve, answer, and cross-action, the court dissolved the temporary injunction, and on a hearing of appellees' cross-action enjoined appellants Crotty, Wimberly, and Shackelford from acting or assuming to act as executive committeemen, managers, or otherwise for or on behalf of the Oil Lease & Royalty Syndicate, and from interfering with the stockholders and directors of the Syndicate in the exercise of their rights, duties, and functions as such, and from occupying the offices of the Syndicate from and after two weeks from the date of the entry of the decree, and enjoining such parties and the Oil Lease & Development Company from attempting to enforce the contract between the Syndicate and the Development Company.

In addition to the foregoing, it appeared on the trial of the motion to dissolve and appellees' cross-action, that approximately $38,000 had been paid to those in charge of the association. None of the executive committee, with the exception of Shuttles, had paid in any money, and Shuttles only paid in $25, the par value of the share of stock issued to him by the executive committee. Beeler claimed to have purchased $1,000 in stock. The purchase was made, however, after the meeting of the stockholders, and payment was made by having a charge entry made against Beeler on the books for that amount. Beeler claims the association was in debt to him in excess of that sum at that time. The evidence also tends to show that appellants Crotty, Shackelford, and Wimberly were to an extent engaged in personal transactions which brought them in competition with the business of the association; also that Beeler and Shuttles, during the controversy concerning the management of the association which shortly preceded the litigation, repudiated the contract between the Syndicate and Development Company, to which was attached Beeler's signature and which he acknowledged, which is asserted in this proceeding to be improvident, and a fact justifying the court's action, and which contract the evidence shows the appellants intended to enforce.

[1-3] Counsel, as the statute permits, have presented the appeal informally in written arguments in lieu of the usual briefs, which has in a measure delayed a determination of the appeal. From an examination of the arguments and the record, we have reached the conclusion that the correctness of the court's action in issuing the injunction turns largely, if not altogether, upon the right of the shareholders to displace the executive committee with the board of directors. That question itself is to be determined by the articles of association, with which the shareholders were presumed to be familiar when they become members of the association by the purchase of shares therein. Of assistance in determining the question is the ascertainment of the legal status of the association and its shareholders. The parties obviously constituted a voluntary association of individuals, whose legal liabilities, rights, and duties are uniformly held to be those of partners. Allen v. Long, 80 Tex. 261, 16 S. W. 43, 26 Am. St. Rep. 735; Industrial Lumber Co. v. Texas Pine Land Ass'n, 31 Tex. Civ. App. 375, 72 S. W. 875; Sergeant v. Goldsmith Dry Goods Co., 159 S. W. 1039; 30 Cyc. 397; 20 R. C. L. 1074.

Distinctions are drawn by some of the authorities between ordinary partnerships and voluntary associations, those noted being that the death of a member or the sale of

his interest does not dissolve the association, as in case of partnerships, nor is there any delictus personæ or choice of partners in associations, since the interest therein is generally evidenced by certificates similar to those evidencing corporate stock, the sale and transfer of which passes the interest of the holder; nor does each member of the association speak and act as its agent as in case of partnership, since usually its affairs are conducted by managers, trustees, or similar officials, whose authority and duties are ordinarily prescribed or limited by the by-laws. 20 R. C. L. 1075. As much was said in Industrial Lumber Co. v. Texas Pine Land Ass'n, supra. So far as relates to ordinary partnerships, the control and management of the business is with the majority of the partners, although it may by agreement be committed to one or more of the partners. 30 Cyc. 446. It thus results that control and management may by agreement be committed in either partnerships or associations to designated persons, and that in the case of associations that course is usually pursued.

In the case at bar those signing the agreement committed the control and management to themselves in the manner we have detailed, and before any of them had contributed anything to the association, as well as before those who subsequently contributed the bulk of the funds to the association voluntarily became members thereof. The latter, however, having, as we have indicated, presumably with knowledge of the provisions of the agreement, purchased and accepted shares in the scheme, are apparently bound thereby. The question, then, is, Were such shareholders authorized under the provisions of the agreement to take the management of the association from the executive committee? and that as we have also indicated, depends upon the provisions of the articles of association. By those articles the control and management of the association were in the first instance committed to the executive committee. By them it was also provided how such control and management should be withdrawn from them, and lodged with a board of directors. The method of relieving the executive committee of control is found in the seventh article of the agreement, which, after designating the committee, declares the committeemen "shall hold their office until called together for the purpose of electing trustees (directors) to take over the accumulated assets and create a declaration of trust or corporate body out of the accumulations of this syndicate." The ninth article of the agreement provides that, "after the dissolution of the executive committee as provided in article 7," the "affairs of the syndicate and the conduct of its business shall be under the direct management of a board of directors, to be selected

217 S.W.—67

from the shareholders themselves at stated meetings," the number of directors to be determined by the shareholders. It will be observed that the provision quoted from the seventh article might literally be construed to contemplate the election of the board of directors by the executive committeemen, since it provides that the committeemen shall hold office "until called together for the purpose of electing" directors, etc. The ninth article, however, provides for the selection of directors by the shareholders. As a consequence, the provisions are conflicting and inconsistent, and must be construed so as to give effect to the intention of the parties as reflected by the agreement as a whole.

That intention we believe to be clear from the instrument under discussion. The plan was to raise money with which to buy and sell oil and gas leases and royalties, the amount so raised not to exceed $250,000. Those named as executive committeemen were charged with the presentation of the scheme to investors, authorized to issue shares, receive money, and otherwise manage its affairs, pending the time when accumulations of money warranted either incorporation or naming of directors by the shareholders (though the amount of the accumulations necessary to authorize such course was not specified), at which time it was the intention to turn the concern over to directors or trustees selected by such shareholders. Such is the general plan deducible from the instrument as a whole. The provision in the seventh article for the election of directors by the committeemen is not only in conflict with the specific provisions of the ninth article, and with the general plan of the agreement, but is so at variance with fairness and the usual course in such matters as to suggest that it was the result of inadvertence or careless expression, so as to warrant us in holding that it in no respect speaks the intention of the parties. Any other conclusion would result in effect in placing the executive committee, or those whom they might designate, in perpetual control of the affairs of the association, and hold as meaningless the provision in the same instrument specifically placing the ultimate control with the majority of the shareholders.

[4] There is some contention that the shareholders were irregularly called together, and for that reason the selection of the board was void. Whether the executive committee in fact called the meeting of shareholders, or whether a majority of that committee authorized the call that was issued, was an issue of fact to be determined by the trial judge. The effect of his order was to find that such a call was issued. As we have said, there was evidence to support the finding. That being true, we have no authority to disturb his conclusion.

Having concluded that the board of directors were selected in accordance with the provisions of the articles of association, and that they were hence rightfully entitled to control and, manage the affairs of the association, to the exclusion of the executive committee, there remains but little else to discuss, since that issue subordinated all others at the trial, and is, as we have said, determinative of nearly all others. We will, however, discuss one or two others.

[5] The action of the court in restraining appellees from attempting to enforce the contract between the Syndicate and the Development Company is attacked as being without warrant in law. This contract, the provisions of which we have detailed at another point, reserves to the Development Company one-half of the net earnings of the Syndicate, however arising, for a period of 25 years. As consideration therefor the Development Company agreed to transfer, to the Syndicate whatever interest it had in and to "certain exclusive sales contracts covering oil and gas leases in Erath and Comanche counties," and to furnish the Syndicate "such geological information regarding the oil-bearing territories of Texas as it may be possessed of." We do not desire to prejudge the facts which may be developed upon final trial concerning the value of the "sales contracts" transferred to the Syndicate, or the "geological information" possessed by the Development Company, as a valuable consideration, or to record at this time that it is or is not our opinion that the contract should be held void as matter of law. But we have reached the conclusion that, in the absence of any showing in that respect, and in view of the fact that the evidence fails to show that the promoters of the Syndicate and the directors and stockholders of the Development Company, who are identical, disclosed to the shareholders in the association the existence of the contract at the time of their purchase of certificates in the latter, the court was warranted in temporarily restraining any attempt to enforce same, particularly in view of the fact that all interested therein were before the court requesting equitable relief pro or con, and that it was the intention of those in charge of the Development Company to enforce the contract unless restrained.

[6, 7] It is contended that the decree of the court is too comprehensive, in that it in effect grants all the relief sought by the pleading, and all that could have been granted by the court on final hearing. The fact that the court granted all the relief sought is not, in our opinion, any ground for revising the decree, if the evidence and the rules of equity authorized it. The decree is interlocutory, and appellants, on all issues of fact, are entitled to a trial by jury, on regular assignment of the case, if demanded.

[8] It is also urged that the decree is erroneous because of the failure of the trial court to require from appellees a bond pendente lite. Article 4649, Vernon's Sayles' Texas Civ. Stats., declares that no injunction shall be granted, save upon petition sworn to before some officer authorized to administer oaths, etc. Article 4650, Id., in substance authorizes the trial judge to grant injunction, upon such petition, upon such terms, limitations, and restrictions as he may specify in a written order indorsed on the petition or annexed thereto, in which he shall also specify the amount of bond to be given by the applicant as a prerequisite to the issuance of the writ. Article 4654, Id., provides, among other matters, that upon filing the petition in the proper court the writ may issue only upon the filing with the clerk of a bond in the amount fixed by the court, signed and conditioned as therein provided, and approved by the clerk. The foregoing provisions seem to relate to injunctions granted upon sworn petitions alone. Whether upon a full hearing pendente lite the trial judge might not, in the exercise of his discretion, issue injunction without requiring bond, seems never to have been decided, though it has been indicated by a divided court that it may. Pierson v. Connellee, 145 S. W. 1039. However, appellees express their willingness to execute statutory bond in such amount as this court may require. Such procedure is authorized. El Campo Light, Ice & Water Co. v. Water & Light Co. of El Campo, 132 S. W. 868.

For the reasons indicated, the judgment of the court in restraining appellants from doing the things enumerated in the decree herein recited pendente lite will be affirmed, upon appellees, within 15 days from the filing of this opinion, executing a bond in the sum of $5,000, payable and conditioned as required by law, and approved by and filed with the district clerk of Dallas county, Tex.; otherwise, the order of affirmance will be subject to such modification as this court may deem equitable.

Affirmed conditionally.