MERCHANTS' &. MFRS.' LLOYDS' INS. EXCH. et al. v. SOUTHERN TRADING CO. OF TEXAS. (No. 8824.)

(Court of Civil Appeals of Texas. Ft. Worth. April 6, 1918. Rehearing Denied June 15, 1918.)

1. INSURANCE ☞13 — ACTION ON POLICY — PARTIES—"UNINCORPORATED ASSOCIATION."

A Lloyd's association, issuing policies of insurance signed by a number of underwriters, the names of whom are attached to the policy, the liability of each being fixed at a certain percentage of the loss, constitutes an "unincorporated association" within Vernon's Sayles' Ann. Civ. St. 1914, art. 6149, providing that unincorporated joint-stock companies may be sued by their company names.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Association.]

2. INSURANCE ☞609—ACTION ON POLICY—PARTIES.

· A Lloyd's association doing business in the state by issuing policies signed by numerous underwriters may, under Vernon's Sayles' Ann. Civ. St. 1914, art. 6149, be sued in its distinguishing name and individual underwriters may be joined.

3. INSURANCE ☞609 — ACTION ON POLICY — LIABILITY OF UNDERWRITERS.

Where underwriters signed an insurance policy as members of an unincorporated association, their liability to the insurer is that of partners, in view of Vernon's Sayles' Ann. Civ. St. 1914, art. 6151, making members of unincorporated companies individually liable in suits against such companies, and article 6126, excepting the business of insurance from limited partnership laws, although the policy limited

the liability of each one to a certain percentage of the loss.

4. INSURANCE ☞609 — ACTION ON POLICY — PARTIES—JOINT AND SEVERAL JUDGMENTS.

In a suit on an insurance policy signed by numerous underwriters, where their attorneys in fact have executed a bond to pay off any judgment against the company, every member of the company was bound by a joint and several judgment in favor of the insured.

5. INSURANCE ☞665(3)—ACTION ON POLICY—EVIDENCE—SUFFICIENCY—"PREMISES."

In a suit on a fire insurance policy, which defendant alleged insured had breached by failing to keep a set of books containing a record of the property on the premises, as provided by the policy, evidence *held* sufficient to support a finding that insured did keep the requisite books; "premises" including not only buildings, but land upon which they are situated.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Premises.]

6. INSURANCE ☞146(3) — POLICIES — CONSTRUCTION.

In construing policies of insurance, the language used in them must be liberally construed in favor of the assured, so as not to defeat his claim to indemnity.

7. INSURANCE ☞335(3)—ACTIONS ON POLICY —DEFENSES.

In a suit on a fire insurance policy, wherein defendant alleged the insured had failed to keep a set of books as provided for in the policy, such failure did not defeat the right to recover, in view of Act April 2, 1913 (Acts 33d Leg. c. 105) § 1 (Vernon's Sayles' Ann. Civ. St. 1914, art. 4874a), providing that no breach of any warranties or conditions shall avoid the policy unless such breach contributes to bring about the destruction of the property.

8. INSURANCE ☞304—POLICIES—PROMISSORY WARRANTIES—DEFENSES.

Act April 2, 1913 (Acts 33d Leg. c. 105) § 1 (Vernon's Sayles' Ann. Civ. St. 1914, art. 4874a), providing that no breach of any warranties or conditions shall avoid an insurance policy unless such breach contributes to bring about the destruction of the property, includes all promissory warranties, and promissory warranties, breach whereof could, in no event, contribute to or bring about loss under the policy, are not impliedly excluded from the effect of the statute.

9. STATUTES ☞181(1) — CONSTRUCTION — INTENT OF LEGISLATURE.

In construing statutes, effect must be given to the intention of the Legislature.

10. STATUTES ☞188 — CONSTRUCTION—LANGUAGE

Where the meaning of the language of a statute is plain, it must be given effect by the courts.

11. STATUTES ☞184—CONSTRUCTION—INTENT.

Every statute must be construed with reference to the object to be accomplished, and in ascertaining such object the occasion and necessity of the enactment of the statute may be considered.

12. INSURANCE ☞675—ACTION ON POLICY—COSTS.

In action on a fire insurance policy, underwritten by numerous parties, some of whom were not served, costs incurred in attempting to serve such parties were improperly taxed to defendant, although plaintiff prevailed in the suit, since they were not necessary parties.

Buck, J., dissenting in part.

Appeal from District Court, Tarrant County; R. E. L. Roy, Judge.

Suit by the Southern Trading Company of Texas against the Merchants' & Manufacturers' Lloyd's Insurance Exchange and others. From a decree for plaintiff, defendants appeal. Affirmed.

Bryan, Stone & Wade and E. H. Ratcliff, all of Ft. Worth, for appellants. S. C. Rowe, of Ft. Worth, and Thos. H. Ball, of Houston, for appellee.

CONNER, C. J. The appellee, a corporation, filed this suit in the district court of Tarrant county against the appellants, Merchants' & Manufacturers' Lloyd's Insurance Exchange, I. H. Kempner, and B. J. Cunningham, as its attorneys in fact, and against said I. H. Kempner, B. J. Cunningham, and 74 other individuals, firms, and corporations, residing in and citizens of various counties in Texas, alleging that said insurance exchange "is an association or partnership composed of" the other persons, partnerships, and corporations made defendants in the suit; that the business of said insurance exchange is in charge of I. H. Kempner and B. J. Cunningham as attorneys in fact, the business being conducted at Galveston, Tex.; that the insurance exchange and "members thereof" are engaged in the fire insurance business in Texas, and that the insurance exchange and the 76 other defendants named are all jointly and severally liable for losses suffered while policies of insurance issued by them are in force. The appellee further alleged that on January 6, 1916, the insurance exchange and the other defendants named made and delivered to plaintiff their certain policy of insurance of that date for $1,500 as follows: $500 on a certain one-story building and $1,000 on merchandise located in said one-story building, "consisting principally of steam engines, gasoline engines, pumps, press powers, steam cylinders, hydraulic rams, and such other machinery not more hazardous such as is usually kept for sale in a machine shop." It was further alleged that on the same date said defendants issued another policy to appellee for $3,500, "on their stock of merchandise, consisting principally of new and secondhand machinery, gasoline engines, pumps, shafting, belting, pulleys, gin outfits, boilers, tanks, and such other machinery not more hazardous and held in trust by them or sold, but not delivered, while contained in the two-story building." Both buildings were situated upon the same lot in the city of Ft. Worth, the two houses closely adjoining. It is further alleged that on June 3, 1916, when said policies were in full force, the property thereunder insured was either totally destroyed by fire or greatly damaged, so that appellee suffered a loss greatly in excess of the amount of said policies; that appellee had complied with all the terms, conditions, and stipulations of the policies, but that the defendants had failed and refused to pay the same. It was alleged that it became the duty of Kempner and Cunningham as attorneys to pay the amount of the said policies, but that they had wrongfully refused to do so, etc. The insurance exchange and 56 of the other 76 defendants named in the petition answered, the remaining 20 defendants, not having been served with citations, were, as we are authorized to infer from the record, dismissed. The defendants who answered pleaded in abatement misjoinder of parties and a want of jurisdiction in the district court, and also to the merits pleading breach of a promissory warranty by which it was alleged the assured agreed to make and prepare in the regular course of business after the date of the policies a set of books which should clearly and plainly present a complete record of business transacted, including a "complete record of all of the property which shall go into the premises and be added to the stock, and all property taken from the stock, whether by the assured or by others, even though not technically purchases or technically sales," and on this account and for other reasons stated the answering defendants denied liability, etc. The case was submitted to the jury under a general charge of the court, and the jury rendered a general verdict for the plaintiff, upon which verdict a judgment was entered against the insurance exchange and the 56 other defendants, who answered jointly and severally, for the full amount of the policies declared upon, from which judgment an appeal has been duly prosecuted to this court.

Inasmuch as several questions presented arise out of the peculiar wording and circumstances of the policies declared upon, we will here refer to them with some particularity. They are substantially the same, save that one of the policies, as already indicated, covered the one-story building and the merchandise therein situated, and the other covered the merchandise situated in the adjoining two-story building on the same lot. The policies were issued by I. H. Kempner and B. J. Cunningham as "joint attorneys for each underwriter." The policies provided that:

"Each of the individual underwriters hereto, as separate underwriters, each acting separately and not jointly, or one for the other, nor for any of the others, each represented by and acting through I. H. Kempner and B. J. Cunningham of the city of Galveston, Texas, as attorneys in fact for each underwriter, in consideration of the stipulations and conditions therein contained and of the payment to and receipt by each of them of his respective proportion of the sum of seventy-eight and seventy-five one hundredth dollars as premium does hereby separately insure the Southern Trading Co. of Texas, etc., * * * against all direct loss or damage by fire except as hereinafter provided to an amount not exceeding for each underwriter his pro rata portion of percentage as indicated by the rider attached, of the amount hereof insured," etc.

Attached to the policies was a list of the underwriters, purporting to show by figures opposite their respective names their individual subscription to the assets of the company, and the percentage of the total risks assumed under the policies contracted by each of them, respectively, to wit, I. H. Kempner, president, Texas Bank & T. Co., subscribed $21,000, 10 per cent.; I. H. Kempner, Bank '& Cotton factor, subscribed $15,000, 7½ per cent.; then follows some 70 or more other named persons, firms, or corporations, with subscriptions ranging from $10,000 to $1,000, and with percentage of loss assumed from 5 to one-half of 1 per cent.

Arising out of such wording of the policies appellants insist that the court erred in not sustaining their plea of misjoinder of parties and causes of action, the contention being that where the liabilities of each underwriter is fixed at a certain and definite percentage of the loss, and the policy stipulates that the liability of each is separate and distinct from that of any and all other underwriters, it is a misjoinder of parties and causes of action for the plaintiff to join all underwriters in one suit. While it possibly should be held otherwise under the strict rule of the common law, in equity and under our liberal system of pleading and practice, we feel no hesitation in saying that the plea of misjoinder was not well taken. "The fundamental rule as to parties to suits in equity is that, however numerous they may be, all persons interested in the subject of the suit and its results should be made parties. The reason for the rule is the aim of the court of equity to do complete justice by embracing the whole subject, deciding upon and settling the rights of all persons interested in the subject of the suit, to make the performance of the order perfectly safe to those who have to obey it, and to prevent further litigation." 16 Cyc. 181. The principle thus announced has been applied in many of our decisions. Thus it is said in Moore v. Minerva, 17 Tex. 20, to be "common in chancery, when several claim under the same title to decree to each one his own particular interest; and our proceeding by petition is analogous to a proceeding in chancery. There is no inconvenience in such rule; it dispenses with a multiplicity of suits, which is a favored object, always to be encouraged by our jurisprudence," etc. That was a case where a negro mother and her children instituted a suit to establish their freedom, claiming, under a deed of manumission to the mother, damages for services being also claimed, and the court said:

"The parties, all claiming their freedom under the same title, might well unite in the action; and, so far as the damages for the deprivation of their liberty is involved, though the damage would be separate and to each individual according to the proof of the value of their services, there can be a separate judgment. The judgment and decree would be in favor of each for his freedom, and the damages assessed to each."

We see no reason why the rule thus indicated is not equally applicable here. As will be observed, the defendants in this action all joined by their authorized agents in the execution of the policies of insurance declared upon. They are parties to the policies, all jointly interested in them and all liable thereunder, and even if their liability is but several, and even though in the adjustment of the litigation the court should find it to be necessary to adjudge damages against each defendant severally to the extent only of the liability incurred by him. The court nevertheless retained jurisdiction over all.

We will not, however, dwell at length upon the general principles last above indicated, for we think we have statutes which control the subject. By an act of the Legislature entitled "An act to authorize unincorporated joint-stock companies or associations to sue and be sued in their company or distinguishing name, and to prescribe the mode and effect of service on such unincorporated companies, and the legal effect of judgments that shall be rendered in such actions, and declaring an emergency," approved April 18, 1907 (Acts 30th Leg. c. 128), and embodied in chapter 2, tit. 102, of Vernon's Sayles' Tex. Civ. Stats. vol. 4, in articles 6149–6154, inclusive, it was provided, in section 1 of the act:

"That thereafter any unincorporated joint-stock company or association, whether foreign or domestic, doing business in this state, may sue or be sued in any court of this state, having jurisdiction of the subject-matter, in its company or distinguishing name; and it shall not be necessary to make the individual stockholders or members thereof parties to the suit."

The act further provides that in suits against such companies or associations service of citation may be had on the president, secretary, treasurer, or general agent, and that in suits by or against such parties the judgment rendered shall be as conclusive on the individual stockholders and members as if they were individual parties to the suit. In section 5 of the act it is, among other things, further provided that, in suits against such company or association, where service has been had as before pointed out:

"Service of citation may also be had on any or all of the stockholders or members of such companies or associations, and in the event judgment shall be against such unincorporated company or association, it shall be equally binding upon the individual property of the stockholders or members so served," etc.

[1, 2] We think that as alleged and shown in the record before us the underwriters answering the appellee's suit constitute an unincorporated "association" (see Hoadley v. Purifoy, 107 Ala. 276, 18 South. 220, 30 L. R. A. 351), as that term is used in the statutes, and that the act clearly implies that where such association is doing business in this state, having a general attorney or attorneys as herein shown, that the association may be sued in its distinguishing name and the individual members thereof may be joined,

thus closing the door against perplexing questions that may be urged relating to the subject of the proper parties to the suit which arise, as here, out of the fact that the members have undertaken to limit their liability to specified amounts or in any specified ratio.

What we have said in disposition of appellant's first assignment of error also in part answers, we think, the further question raised in appellant's fourth and fifth assignments, of whether the judgment was properly rendered for the full amount against each of the several underwriters, as well as against the association in its distinguishing name. We confess to some difficulty in attempting to properly classify the business as transacted by the appellant association. We have statutes authorizing limited partnerships: See title 102, c. 1, 4 Vernon's Sayles' Tex. Civ. Stats. But the business of banking or insurance is specifically excepted from the operation of those laws. See article 6126 of the chapter referred to. We also have laws purporting to authorize, under certain regulations, individuals, partnerships, and corporations to enter into reciprocal contracts of insurance with each other or with individuals, providing indemnity against any loss which may be insured against except life insurance (see General Laws 1915, p. 269, c. 156 [Vernon's Ann. Civ. St. Supp. 1918, arts. 4972a to 4972k]), but it affirmatively appears in the case before us that the appellant underwriters doing business in the associated name of the "Merchants' & Manufacturers' Lloyd's Ins. Exchange" have not complied with the act just mentioned, so that appellants have no specific legislative authority for doing business as they do. The policies of insurance under consideration were issued by I. H. Kempner and B. J. Cunningham by virtue of a power of attorney executed by the underwriters herein sued, specifying that such attorneys shall have power "to execute policies of insurance, to accept and make binding, upon me, applications for such insurance, to subscribe with my name, issue, change, modify, reinsure or cancel contracts therefor, containing such terms, clauses, conditions, warranties and agreements as they deem best; to demand, receive, collect and receipt for all premiums of any such contracts; to adjust and settle all losses; to receive, give or waive any notices of proofs of loss; to appear for me in any suits, actions, or proceedings, and bring, defend, prosecute, compromise, settle or adjust the same, and in general, no matter whether specifically authorized herein or not, to do or perform every act that I, myself, could do in relation to the performance, compromise, settlement or adjustment of any contracts of insurance herein authorized."

The power of attorney was made subject to the terms and conditions of an "agreement between individual underwriters," to the effect that the agreement should become operative when such number of individuals had signed it making total subscriptions aggregating not less than 100, nor more than 1,000, units as defined in the agreement, and each paid in pro rata cash deposit as required. By the terms of the agreement each unit consisted of a cash deposit of $200 by each underwriter, together with the underwriter's interest-bearing note for $800, making a total of $1,000 in assets representing each unit, and it was provided that "each such unit subscribed shall be the based pro rata of profits or losses as the subscription to each underwriter bears ratio to entire number of units subscribed and in force by all underwriters at that time." It was further provided that on the 31st day of December annually thereafter a committee, with the assistance of the attorneys, should value the assets to the credit of each underwriter and estimate and deduct amounts sufficient to cover all losses and expenses known to have occurred and sufficient to pay all outstanding liabilities of every kind, including the pro rata return premium on all outstanding policies if canceled on that date, "and the balance over and above the original amounts paid in by each underwriter, will be the net profits remaining to his credit, which the committee shall pay to each underwriter, after deducting the attorneys' contingent compensation, which shall be 20 per cent. of the net profits accumulated to each underwriter." In considering a contract of insurance very similar to those involved in this case, the Dallas Court of Civil Appeals, in an opinion by Mr. Justice Rasbury, among other things had this to say:

"After careful consideration of the plan of the association as shown by the application and policy, we have concluded that, while the purpose of the association may have been for mutual fire protection, it was as much also for mutual profit and advantage. In short, to secure for its members fire insurance on the mutual plan at less than the then prevailing or stock company rates."

The court further stated:

"While it is true that most of the adjudicated cases dealing with the liability of individual members of associations have reference to unincorporated joint-stock companies in which the members of the association hold either stock certificates or other evidence of his interest in the association, and in which the concern dealt more generally with the public than in the instant case, as, if for example, the Commercial Underwriters had insured the public against loss by fire without limitation on its liability, nevertheless we can see no real distinction as to the liability of members of such associations and the one in the instant case to third and noninsuring persons for debts incurred by the association in conducting its business. Any intended or, for that matter, express limitation among the members of their individual liability could no more control the rights of third persons than could a similar agreement between members of an ordinary partnership. Members of such associations must know that liability of no small extent to third persons will be incurred, and to say that such associations may be permitted to distribute the ordinary profits of a fire insurance concern among themselves in cheapened rates, and yet not be liable for the

debts incurred in that behalf, is to do violence to well-settled rules of law and equity. The members of the association are individually liable because they are all principals, and, being principals, are bound in the same manner and for the same reason that members of an ordinary partnership are bound. [Lewis v. Tilton], 64 Iowa, 220, 19 N. W. 911, 52 Am. Rep. 436"—and finally concluded as follows:

"In view of what we have said, it follows that we are of the opinion that the members of said association are individually liable for the debts incurred by their manager and others in conducting and maintaining the business of the Commercial Underwriters during their membership, and that the court below erred in sustaining the general demurrer in that respect."

See Sergeant v. Goldsmith D. G. Co., 159 S. W. 1036.

[3] Appellee was not a subscriber in the appellant association, and as to its right what was said by the Dallas court in the quotations made we think has application here. As between themselves the appellant underwriters might, if they choose, for their own protection limit their liability, but as to appellee who was not a party to their agreement, their liability, as we think, was essentially that of partners. To our minds the legislative acts already referred to indicate that the policy of this state is against permitting an association of individuals to engage in the business of fire insurance for profit in all essential respects as a partnership and as against the business public to limit their liability as here attempted. The business of fire insurance is expressly excluded from the benefits of our law relating to limited partnerships, and in the act also heretofore referred to authorizing suits against unincorporated associations of the character of the one under consideration. See Acts 1907, p. 240, Vernon's Sayles' Tex. Civ. Stats. art. 6151. It is expressly provided that:

"In suits by or against such unincorporated companies, whatever judgment shall be rendered shall be as conclusive on the individual stockholders and members thereof as if they were individually parties to such suits."

We therefore conclude that the court did not err in rendering judgment against the appellant association and against each of the answering subscribers for the entire amount of the judgment.

If, however, it must be said that we are in error in the foregoing conclusions, we do not think it would affect the validity of the judgment. As may be seen from quotations hereinbefore made, the powers of Cunningham and Kempner as general attorneys for the association are very broad. The subscribers expressly authorized them to "perform every act that I, myself, could do in relation to the performance, compromise, settlement or adjustment of any contracts of insurance herein authorized." The agreement made part of the power of attorney also contains the further provision that:

"In case any suit shall be brought against one or more of the underwriters on any policy thereunder, the citation shall be immediately delivered to the attorneys, and the attorneys shall have the power, and it shall be their duty to conduct the litigation, and they shall have power to settle or compromise any suit; when final judgment shall have been rendered against any one or more underwriters in any such suit, the committee and attorneys, or either of them, shall pay, settle or compromise the liability of the remaining underwriters on any such policy without further litigation, according to the judgment obtained in any such suit as conclusive and as determining his liability whether he be a party to such suit or not."

[4] The record discloses that during the pendency of the suit below said attorneys for and in behalf of the appellant association and for themselves executed a bond in the sum of $7,500, payable to the appellee company, "conditioned that said defendants will pay off and discharge any judgment that may be obtained against them by said Southern Trading Company." It would seem that the execution of this bond in the name of the exchange by virtue of the power of attorney bound every member of the association. Therefore, at all events, the judgment should be affirmed. Moreover, inasmuch as by the terms of the agreement between the individual underwriters it is provided in substance that losses and expenses known to have accrued in business shall be estimated and deducted out of the association assets by the committee provided for with the assistance of the attorneys sufficient to pay "all outstanding liabilities of every kind," and inasmuch as there is nothing in the record to indicate that the association does not have now in possession assets fully sufficient to meet appellee's loss under his policies, it is not apparent that the other underwriting defendants are in any event materially prejudiced by the judgment as rendered.

Of the policies sued upon in this case $500 was made to cover the one-story building described in the plaintiff's petition, and the remaining $4,500 covered the machinery and personal property alleged to have been lost. Under our laws the $500 on the one-story building which was destroyed constitutes a liquidated demand, and as to the remaining $4,500 appellants, by other assignments, insist that no right of recovery existed, for the reason that the promissory warranty of the policies declared upon and set out in the beginning of this opinion had been breached. In harmony with this defense appellants requested a peremptory instruction in their favor as to $4,500 of the plaintiff's claim, and also made appropriate objection to the court's main charge, wherein the court submitted to the jury the question of whether or not the plaintiff had "substantially" complied with what was known in the evidence as the "record warranty clause" of the policies of insurance sued on. Appellant's contention is that the undisputed evidence showed that plaintiff did not keep a set of books as contemplated by the clause referred to, and that therefore the peremptory instruction should have been given as requested, and that the court was in error in sub-

mitting the issue as he did. For the sake of clearness we will here quote in full the record warranty clause relied upon by appellants in so far as the same is applicable to the question now before us:

"The assured will make and prepare, in the regular course of business, from and after the date of this policy, a set of books, which shall clearly and plainly present a complete record of business transacted, including all purchases, sales and shipments, both for cash and on credit, or this entire policy shall be null and void. The term 'complete record of business transacted,' as used above, is meant to include in said set of books, a complete record of all the property which shall go into the premises and be added to the stock, and of all property taken from the stock, whether by the assured or by others, even though not technically purchases or technically sales."

The evidence shows that appellee made and kept inventories as required by the terms of the policies, and no attack is made thereon. The evidence relating to the warranty referred to is somewhat voluminous and because of its volume we will not undertake to quote it all. We will, however, here set out enough of it to show the basis of the controversy in this respect. The bookkeeper Tolbert testified, among other things, as follows:

"The books kept by me as a record of the company's business consisted of ledger, cashbook, salesbook, and journal, and we also had an order system that we kept for orders of machinery, an order book that we kept when we sold a contract. We sold most of the machinery by a written contract, and when we would make a sale, we would make an entry in our order book, showing what we sold, and if there was a trade and we took in any machinery in the trade, that also showed in the order book; those were the principal books. The order book we had was a loose-leaf system. The order system was handled in this way: When we would make out the order, we would make it in duplicate, and one of those orders would go to the shop, and we would keep one copy in the office, and the other went out to the shop for them to fill out and make shipments on."

Geo. B. White, president of the appellee company, after testifying that Mr. Tolbert was their bookkeeper, and that he had been with the company for 10 or 12 years and perhaps longer, further testified in part as follows:

"As far as I know, the company kept accurate books and accounts; it was our intention to do so, and we tried to keep them accurately. When a piece of secondhand machinery would be traded for, it would be entered on the books at the valuation which we allowed our customer for it. It would be entered on what we call our order book; the sale was kept on that order book, and it showed what we allowed him for it, and when we shipped out his new engine, or whatever it would be, if the old engine we took in hadn't been shipped in yet, we charged it to that man's account until the engine, or whatever it was, came in, and when it arrived at our place of business, then we credited it on his account. Of course, Mr. Tolbert can explain that to you better than I can. In making a trade of that kind, when the goods were shipped in the entries were then transferred from the order book to the ledger. All the items of property which we traded for, and which had not been shipped in yet, appeared on our books as a charge against the person from whom we ob-

tained same. It is not a fact that the Southern Trading Company had boilers and engines, and other character of machinery scattered about over the state at different places, which hadn't been shipped in at the time of this fire. I don't think there were a great many of those items standing out in the country; it is true there were probably a few pieces, but not many. Where the word 'indefinite' appears on our books, it probably has reference to something that wasn't very salable, and we didn't want to bring it in until we had a sale for it. It is true that some of these items at the time of the fire had been permitted to remain out in other towns and in the country for months; that is true as to a few of the items, but not very many. Our books would show what items were at other towns and out in the country. Mr. Tolbert can tell you more·about how those things were handled than I; I am not a bookkeeper. Now, we had some machinery out in the country that had been sold and hadn't been paid for, and we had had to take it back. Of course, that wasn't on the books, but was on a note from the party · that we held. In our books we did not keep a separate account of the machinery and various items of merchandise in the little building; it was all kept together. The little building was just 15 feet away, just far enough for a wagon to come through, and we had it all connected up there with a crane running between the buildings, and we used the two buildings together, used it all as one and the same building. It is true that from our books it would be impossible to determine what items of property or individual pieces of property were located in the smaller building, covered by the policy, at the time of the fire; we couldn't tell it from the books, but we did from the property itself a day or two after the fire when we made an inventory of it. It is true that we were unable to determine from the books the property in the different buildings, but that we undertook to identify the remains of the fire. The last general inventory was taken about January 1, 1916. It is true that from our books alone I couldn't tell in which building any specific property was kept. It is true that at the time of the fire there were some boilers and engines on the outside of the building, but not a great many; there were probably a half a dozen that were so large that we couldn't get them in, but none of the smaller engines were on the outside—they were all on the inside; the Corliss engines were put on the platform or on the outside. Our books didn't show that pieces of machinery were in the building, as distinguished from those that were on the outside, but our inventory showed that we had the engines out there, and they were deducted in making up the proofs of loss. It is true that at the time of the fire our books didn't distinguish or discriminate between the pieces of machinery in the building and those on the outside, but we could tell by going and checking up the different items. I couldn't take my books and show how much belting, fittings, and so forth we had on hand at the time of the fire separate from the engines and other stuff, but we could get pretty close to it by checking it up, which we did. Our books showed just what belting and fittings we had sold."

On redirect examination this witness testified:

"I stated in the conduct of our business, with reference to the merchandise and machinery on hand, that some of it would be in one building and some of it in another, and a comparatively small part of it, which we couldn't get in the buildings, was out in the yard. I could tell from our books and inventories the amount of stock we had on hand, irrespective of any particular building."

The evidence as a whole indicates, if it does not conclusively show, that the value of the goods covered by the policies and lost in the fire by appellee largely exceeded the amount of all policies issued thereon. Indeed, appellants do not seem to assail the sufficiency of the evidence to establish this fact. Their contention is, in substance, that in order for the books to comply with the terms of the warranty, it was necessary that therefrom, without the aid of other proof, the character and value of the property kept in the separate buildings could be severally ascertained. They say:

"The fact that whether or not the amount of the loss can by other means be substantially established has no bearing on the question of whether or not the contract to keep the books in a certain way has been substantially complied with."

Numbers of authorities are cited in support of the contentions indicated, among which are the cases of Teutonia Ins. Co. v. Tobias, 145 S. W. 251; Scottish, etc., Ins. Co. v. Weeks Drug Co., 55 Tex. Civ. App. 263, 118 S. W. 1086. We cannot within reasonable limits review or undertake to distinguish all of the cases cited in appellant's behalf. Those above noted, however, are perhaps as nearly in point as any. By an examination of Insurance Company v. Tobias it will be seen that there was an entire absence from the books of the assured of certain personal property that had been removed from, the building destroyed to a cold storage plant. The question discussed was not so much the sufficiency of the books to comply with the terms of the warranty, but whether a complete failure of an entry of any kind in the respect noted operated as a breach of the warranty. The same is also true of the Insurance Company v. Weeks, supra. In that case the iron safe clause was involved, as well also a warranty to keep a set of books substantially the same as in this case. As to the record warranty clause the court said:

"The books kept by appellee failed to show any entry in the books of the cash sales from November 23, 1907, to the date of the fire, which occurred on January 3, 1908, and because of which, on other grounds, the court held the judgment to be unsupported."

[5, 6] We do not think, under the evidence that we have quoted, that it can be said that in the case here there was an entire failure on the part of appellees to keep a set of books, such as required in the warranty under consideration. Extreme literal performance ought not to be required. It is to be noted that the warranty under consideration does not specifically say that the books shall keep a record of all of the property which shall be contained within the house situated on the lot. The language is "a complete record of all the property which shall go into the premises." The general rule in construing policies of insurance is that the language used in them must be liberally construed in favor of the assured, so as not to defeat,

without a plain necessity, his claim to indemnity which, in making the insurance, it was his object to secure. When the words are, without violence, susceptible of two interpretations, that which will sustain his claim and cover the loss must in preference be adopted. Insurance Company v. Kempner, 87 Tex. 229, 27 S. W. 122, 47 Am. St. Rep. 99; Sov. Camp Woodmen v. Gray, 26 Tex. Civ. App. 457, 64 S. W. 801; Insurance Company v. Wicker, 93 Tex. 390, 55 S. W. 740; Casualty Co. v. Wade, 101 Tex. 102, 105 S. W. 35. The term "premises" has attached to it various meanings, owing to the connection in which it is used, but, generally speaking, the term includes not only buildings, but the lot or land upon which the same are situated. Thus, as used in a policy of insurance covering several buildings and their contents, and providing that, if the above-mentioned premises shall become and remain vacant or unoccupied for more than 30 days, the policy shall be void. The word "premises" was held to cover the whole of the insured property, dwellings, outhouses, and appurtenances, together forming one establishment, and that the policy was not broken by allowing one of the buildings, which had been used as a dwelling house, to remain unoccupied, while another, used as such, remained occupied. See Herrman v. Adriatic Fire Ins. Co., 45 N. Y. Super. Ct. 394-402.

With such meaning attached we think that appellee's evidence was sufficient to support a finding that it did keep a set of books, which clearly and plainly presented a complete record of all of the property which went into appellee's premises; that was added to its stock and all property taken therefrom. As it seems to us a substantial compliance within such provision ought at all times to be held sufficient, but whether so or not, under the very strict construction of such provisions given by some of the courts, we think that in this case the evidence relating to the subject is such as to leave but little room to complain on appellant's part because of the submission of the issue by the court of a "substantial" compliance. In other words, for all practical purposes the evidence shows such a keeping of books as met the substance or spirit of the provision. The proof shows that the two policies sued on were issued at one and the same time upon the general stock of goods kept by appellee in the two buildings situated upon the same lot. The substance of the transaction seems to be an insurance of a single whole, and the fact that the insurance was evidenced by two separate instruments is not entitled to the weight that might, under other circumstances, be given to the transaction.

[7] But if in error in the foregoing views, there is another sufficient answer, as we think, to appellant's contention that the policy was void, because of appellee's failure to keep a sufficient set of books. By act approved on April 2, 1913, entitled "An act to

prevent fire insurance .companies from avoiding liability for loss and damage to personal property under technical and immaterial provisions of the policy or contract of insurance ·where the act breaching such provision has not contributed to bring about the loss, and declaring an emergency," it was enacted by the Legislature of the state of Texas (sect. 1):

"That no breach or violation by the insured of any of the warranties, conditions or provisions of any fire insurance policy, contract of insurance, or application therefor, upon personal property, shall render void the policy or contract, or constitute a defense to a suit for loss thereon, unless such breach or violation contributed to bring about the destruction of the property." Vernon's Sayles' Ann. Civ. St. 1914, art. 4874A.

In the case of Commonwealth Ins. Co. of New York v. Finegold, 183 S. W. 833, the Galveston Court of Civil Appeals held that the section of the act of 1913 just quoted had no application to promissory warranties, which in no event could contribute to or bring about the loss by fire of the insured personal property. In that case it was found that a warranty that gasoline should not be kept on the premises of the insured had not been observed; also that the insured had failed to observe a warranty to keep his books and records in an iron safe. It was held that the act of 1913 applied to the warranty not to keep gasoline on the premises, for it was such a warranty as might, or could, have contributed to the loss shown, although in fact it was shown not to have done so in that case, but that the act was not intended to apply to the warranty to keep books and records in an iron safe. The policy under consideration was therefore declared to be void. The Finegold Case has been followed by the Amarillo Court of Civil Appeals in the case of McPherson v. Camden Life Ins. Co., 185 S. W. 1055, and by the Texarkana Court of Civil Appeals in the case of Westchester Fire Ins. Co. v. McMinn, 188 S. W. 25.

[8] It is with great hesitation that we undertake to voice our inability to agree to conclusions reached in .the decisions named. But we cannot avoid the conviction that the act means just what it says, and that it was the legislative intention in the enactment to preclude defenses to suits upon fire insurance policies on the mere ground that some warranty, condition, or provision of the policy had been violated by the insured, where it was made plainly to appear that such breach had nothing whatever to do with bringing about the loss which it was intended to provide against, and we so held in the case of Ins. Co. v. Nelms, 184 S. W. 1094. The language of the act is "that no breach or violation by the insured of any of the warranties, conditions or provisions of any fire insurance," etc., shall constitute a defense unless such breach or violation contributed to bring about the destruction of the property. No distinction is made in the character of the warranties, conditions or provisions to be affected.

[9-11] We think it is unnecessary to cite a long list of authorities to show the rules adopted by the courts in the construction of statutes, for we think those to which we shall refer are so familiar and well established as to be readily accepted without the aid of adjudicated cases. The great fundamental rule is to ascertain and give effect to the intention of the Legislature. And where the meaning of the language used is plain, it must be given effect by the courts, else they would subject themselves to the objection of exercising legislative powers. Another rule of construction is that every statute must be construed with reference to the object intended to be accomplished by it, and in the ascertainment of the object it is proper to consider the occasion and necessity of its enactment, the defects or evils in the former law, and the statute should be given that construction which is best calculated to secure its object by suppressing the evil and maintaining the benefits intended. With such rules in mind, we will advert briefly to the condition of our law prior to the enactment of the statute under consideration.

As may be seen by reference to Texas cases too numerous to here cite, it had been many times held that provisions in policies of fire insurance classified by the courts as warranties must be strictly observed, otherwise the departure was available as a defense and operated to avoid the policy, even though, as sometimes appeared, the breach of the warranty in no manner affected the risk, contributed to the loss, or rendered materially less certain the fact or extent of the loss. Had we the time, and the necessity for brevity did not preclude, we might demonstrate the condition referred to by a citation of numerous cases, but we will illustrate the subject by a brief reference to a few only. In Hutchison v. Ins. Co., 39 S. W. 325, a statement of the assured, construed to be a warranty, that he resided at Kyle, in Hays county, when he in fact resided 12 miles ·from Kyle, avoided the policy. In Ins. Co. v. Pinson, 94 Tex. 553, 63.S. W. 531, an application for insurance stated that the insured had five living sisters, aged, respectively, 52, 50, 47, 45, and 36. Their respective ages were in fact 49, 46, 44, 36 and 33 years. In a suit on the policy, the statement was treated as a warranty, and it was held that the discrepancy was sufficient to avoid the policy, and that it made no difference that the statement might be substantially true or the difference not material to the risk.

In Ins. Co. v. Long, 51 Tex. 89, it was held that a vacancy of a house for more than 30 days without notice, contrary to the terms of the policy, avoided the policy, regardless of whether the risk was thereby increased. In Henry v. Ins. Co., 103 S. W. 836, it was held that the failure of the assured to keep a rec-

ord of his cash sales in his books for a period of several months, as provided in the record warranty clause of his policy, defeated the assured's right to recover, notwithstanding the cash sales during such period were shown by slips taken from the cash register.

In Rives v. Ins. Co., 77 S. W. 424, it was held that a provision in a fire insurance policy, requiring the assured to keep a set of books, and produce them in case of loss, was not complied with by producing books kept by others for themselves, which showed the facts required to be shown by the plaintiff's books, and a recovery was denied.

The foregoing citations—and others of like import might be cited, all antedating the several statutes hereinafter mentioned—are made for the purpose merely of showing the extreme strictness of compliance required by the courts, with all statements or provisions of insurance policies held to be warranties, and as tending to show that it is not improbable that the ordinary citizen, untrained in the refinements of legal reasoning, should feel some impatience, if not resentment, when defeated in his effort to recover a loss in good faith provided for, by some technical provision the nonobservance of which in no wise augmented the risk, contributed to the loss, or created a doubt as to the fact or extent thereof. At all events, our Legislature, by act approved March 27, 1903 (Gen. Laws 1903, p. 94), among other things expressly declared:

"That any provision in any contract or policy of insurance issued or contracted for in this state, which provided that the answer or statements made in the application for such contract, or in the contract of insurance, if untrue or false, shall render the contract or policy void or voidable, shall be of no effect, and shall not constitute any defense to any suit brought upon such contract, unless it be shown upon the trial thereof that the matter or thing misrepresented was material to the risk or actually contributed to the contingency or event on which said policy became due and payable, and whether it was material and so contributed in any case, shall be a question of fact to be determined by the court or jury trying such case."

Our courts, manifesting the usual hesitation of the lawyer to break away from the precedents and fixed channels of judicial thought, construed the section of the law just quoted as having no application to promissory warranties, such as the iron safe, and record warranty clauses. See Ins. Co. v. Rogers, 60 Tex. Civ. App. 456, 128 S. W. 625; Insurance Co. v. Caraway & Co., 130 S. W. 458. This construction of the act of 1903 was doubtless correct, and we do not wish to be understood as questioning it, for, reading the act in connection with its caption, the language restricted to representations of fact, and not to include promissory warranties or agreements to perform acts in the future. We cite the act and its construction merely to show the trend of legislative thought and the limits given it, to the end that we may more clearly apprehend the legislative pur-

pose in thereafter enacting the law of 1913, which, so far as applicable, we have already quoted.

By again referring to the act and its caption it is manifest that it is not in terms limited to representations of fact, whether made warranties by the terms of the policy or not. It is evidently more comprehensive. The purpose of the Legislature as expressed in the caption of the act was to "prevent fire insurance companies from avoiding liability for loss and damage to personal property under technical and immaterial provisions of the policy or contract of insurance where the act breaching such provision has not contributed to bring about the loss." And the language of the enacting clause is that no breach or violation of any of the warranties, conditions, or provisions of any fire insurance policy, contract of insurance, or application therefor, upon personal property, shall render void the policy or contract, or constitute a defense to a suit for loss thereon, unless such breach, or violation contributed to bring about the destruction of the property.

We do not see how the Legislature could have more clearly announced its purpose or have declared its will. No reference is made to representations of fact, past or present, provided for by the previous law, but the references, and they are specific, are to the warranties, conditions, or provisions in the policy, contract of insurance, or in the application. Nor, as expressed, is the operation of the act limited to any particular character of warranty. The language is any of the warranties, conditions, or provisions, etc.

It seems to us, if language means anything, that the act of the Legislature we are endeavoring to construe means just what it says, that we have no authority to limit it to promissory as distinguished from other warranties, and that it operates on any and every provision of a policy of fire insurance on personal property however classified. In the leading case of Ins. Co. v. Finegold, hereinbefore cited, the court, as already noticed, applied and enforced the act as to the promissory provisions or warranty to "not to keep gasoline on the premises," but refused its application and enforcement to the agreement to keep a set of books, etc. Both provisions were alike promissory in character, and to our minds there is no sufficient reason for the distinction made. It is easily conceivable that in a given case the gasoline provision would in fact be the most material, for its observance would certainly tend to lessen the risk, whereas the failure to keep books would be wholly immaterial in determining the essential issues in the case, should the admitted or undisputed fact be that the character of the goods destroyed was such as were insured and of value largely in excess of the indemnity provided by the policy. The only legitimate function of the iron safe and record warranty clause is to provide

for the making and preservation of written evidence that the goods burned were covered by the policy, and of value equal to the obligation of the insurer, and when these facts can be otherwise established by a preponderance of any other competent evidence, a mere failure, however innocent, to strictly observe the clauses referred to ought not to defeat a meritorious claim. We do not mean to say that the act under consideration is to be construed as denying the right of parties to enter into such reasonable stipulations that may be lawful as they may choose, and we suppose there can be no doubt but that the courts will enforce all such stipulations as are duly shown to be material in fact. We do say and hold, however, that the right of an insurer to select a specified character of evidence is not more important than the correction of the evil which, as we think, induced the legislative act of 1913. We conclude that the court committed no error in refusing appellant's peremptory instruction or in submitting the issue of whether the record warranty clause under consideration had been substantially complied with.

[12] We think what has been said in the foregoing discussions sufficiently dispose of all assignments of error, except the last which complains of the judgment of the court in taxing the costs incurred at appellee's instance in the effort to secure service of citation on the 20 or more underwriters as to whom the suit was in effect dismissed before verdict and judgment. We are of opinion that this assignment must be sustained. Clark v. Adams, 80 Tex. 674, 16 S. W. 552. The court may, for good cause, to be stated on the record, adjudge the cost otherwise than as generally provided by law. See Vernon's Sayles' Tex. Civ. Stats. art. 2048. In the instance before us, however, the court has not stated the cause for his ruling. But appellees in reply to the assignment, state that it was made to appear that the general attorneys for appellants at and prior to the trial refused to divulge the names of the members of the exchange or to give information as to its business condition or affairs, and hence, as is argued, their only guide as to necessary parties, etc., was the list of underwriters attached to the policies declared upon. If we could accept this statement in lieu of the statement of the court contemplated by the statutes we hardly think it a sufficient answer to the assignment, but if it be assumed that appellees had a cause of action against underwriters who are not parties to the policies of insurance declared upon at the time of their insurance, it does not follow that they were necessary parties. If we are correct in our construction of the law discussed in an earlier part of this opinion, authorizing suits and judgments against associations of persons doing business as were appellants, no necessity existed for making the individual underwriters parties

defendant. Appellee, of course had the privilege under the law referred to to make the individual underwriters parties by having them duly cited but this was purely for its own benefit, to the end that a personal judgment might be rendered against those cited as well as against the association, and we think the burden was upon appellee to determine who should be made parties, and to ascertain their several places of residence, etc., and we know of no law which requires a defendant to furnish that information save on interrogatories duly propounded to him under the formalities required by law. As stated, therefore, we think we must sustain the assignment; and, inasmuch as appellants duly but unsuccessfully made the effort in the court below to have the error indicated corrected, we think the cost of this appeal must be taxed against appellee. With this exception all other assignments are overruled, and the judgment in other respects in all things affirmed.

Affirmed.

BUCK, J. (dissenting in part). It is with some reluctance that I enter my dissent from some of the conclusions reached by my Brethren, but, after mature reflection, I cannot concur in the view of majority that the trial court properly entered judgment in this case against each of the defendants cited for the full amount of the recovery. I can see no reason why the express stipulation in the contract of insurance that the personal liability of the several underwriters should not extend beyond the percentage specified should not be given full effect. The policies upon which plaintiff sued provided:

"That each of the individual underwriters hereto, as separate underwriters, each acting separately and not jointly, no one for the other, nor for any of the others, each representing by and acting through" the named attorneys in fact insured plaintiff "against all direct loss or damage by fire * * * to an amount not exceeding for each underwriter his pro rata portion or percentage as indicated by the rider attached," etc.

The rider so attached and thereby made a part of the insurance contract, shows the amount of the entire subscription to the stock of the exchange which each underwriter had made, and the percentage that each of such amounts bears to the whole, and therefore fixes and limits the individual liability for loss under the policy. While I agree with the majority in the conclusion that the judgment was properly entered against the exchange, as an association or quasi partnership, and that such judgment could be enforced against any partnership funds or property, yet I do not believe that a personal judgment against each stockholder should have been rendered for an amount in excess of the percentage specified in the policy. The fact that under title 102, c. 1, article 6126 et seq., Vernon's Sayles' Tex. Civ. Stats., provision is made for limitation upon the liability of special partners in certain kinds of

business, and that the insurance business and the banking business are specially excepted from such benefits, in the opinion of the writer does not control the issues here presented. This piece of legislation evidently had a twofold purpose viz.: (1) To encourage the union of capital in commercial enterprises, without the entailing of general partnership liability as to each contributor; (2) to provide a safe means and method of notice to those dealing with such persons in the ordinary commercial transactions, as to the character and extent of the liability of the several persons interested in the business. This act provides that one or more of the partners must assume general liability. They are presumed to have the general management or control of the business, and are therefore made jointly and severally liable. But as to others, who have no control, voice, or direction in the management of the affairs of the enterprise, but merely have intrusted their funds into the hands and care of those in active management, these may limit their liability by complying with the requirements of this act. The law was passed during the first year of our existence as a state, when there were no men of large capital, when the millionaire was unknown, when capital was scarce and timid, when manufacturing, mechanical, and similar enterprises needed to be encouraged, when inducements were doubtless deemed advisable to bring into active circulation and service the limited savings of the comparatively poor, and of those who had neither time, inclination, nor training for the active management of such lines of endeavor. The probable reason for excluding banking and insurance from the benefits of this act was that the very character of these two kinds of business rendered the character of the notice provided by the act insufficient and impracticable. The bank is the medium of commercial exchange, the trustee of the community's available cash, and to require that those dealing with it in the ordinary transactions of its business must first inquire of the secretary of state as to whether there be any limitation of liability on the part of its individual stockholders, in order to be protected against a hidden reservation, would have tended to discourage rather than to encourage the free circulation and use of money. The insurance business touches the unlearned as well as the learned, the ignorant as well as the wise, the widow and the orphan as well as the experienced man of affairs, the credulous and careless as well as the cautious and skilled. Hence it was properly deemed unwise to include it in the class of enterprises to which this legislation relates. But nothing in this act, or in any other statute of our state, so far as the writer recalls, precludes a limitation of liability by special contract, when the written memorial of the contracting parties specially provides for such limitation. In this event,

the parties are upon an equal footing, dealing at arm's length, and both are fully advised as to the attempted limitation. A person contracting with an insurance company or an association is not required to follow the direction indicated by the index finger of constructive notice, in order to determine whether there be any limitation of liability, but such limitation becomes a part of the written contract, its character and its extent is plainly disclosed to the layman as well as to the lawyer, the unlettered as well as the learned may contract fully informed as to the facts in this particular. The character of policy, with a limitation as to each individual underwriter to a specified amount of percentage, has been sustained by the courts of England and the United States since the time of William III and Queen Anne, when Lloyd's coffeehouse was the wonted resort of seafaring men, and those that did business with them, and there the underwriters of London congregated, having organized at this center an association among themselves, and wrote policies with a similar limitation of individual liability. See 25 Cyc. 1524; 1 Cooley's Briefs on Insurance, p. 53, 4 Cooley's Briefs, p. 3072, 14 R. C. L. 859; McAllister v. Hoadley (D. C.) 76 Fed. 1000; Sumner et al. v. Piza (D. C.) 91 Fed. 677, and authorities cited in these text-books and decisions. The writer does not think that the case of Sergeant v. Goldsmith D. G. Co., 159 S. W. 1036, cited by appellee, and in part relied on by the majority to fortify their conclusion that a personal judgment was properly rendered against each defendant for the full amount of recovery, sustains such conclusion. In the policy there under consideration it was provided that, in consideration of the payment of the premium demanded, "each member of the association in issuing the policy under the authority of their authorized attorney in fact, 'do severally, each for himself or itself, and not jointly, no one being bound for any other,' agree to indemnify the member holding such policy against loss or damage by fire, etc., to the amount named in such policy." The court further says:

"This appears to be an outright unqualified obligation by every member to pay the loss. For the evident purpose, however, of limiting such apparent unqualified liability, the succeeding stipulation contains the provision that 'the responsibility of each subscriber is in the same proportion of the entire loss or damage hereunder which each subscriber's deposit or deposits at the time of such loss bear to the aggregate of all deposits then in force.' By these provisions, taken from both the application and policy contract, the liability of the members is to be measured, and to the extent of such liability each is necessarily an insurer during his membership for all policy holding members during their stay in the association."

As will be noted by a careful reading of this case, the Dallas Court of Civil Appeals only held that in this suit, by the receiver of an unincorporated insurance association against one of its individual underwriters

forming the association, that the individual underwriter was liable in the ratio or proportion indicated by the clause quoted, not that he was liable for the full amount of the policy. The court uses the following language:

"Accordingly we hold that each member holding a policy of insurance in the association at the time of loss under any such policy was bound individually in the ratio or proportion indicated by the clause quoted."

In the opinion of the writer, that portion of the judgment which holds each individual underwriter cited liable for the full amount of the recovery should be reformed so as to limit personal judgment rendered against each individual underwriter to the percentage of the recovery indicated in the policy itself.

━━━

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes