**MERCHANTS' & MANUFACTURERS' LLOYD'S INS. EXCH. et al. v. SOUTHERN TRADING CO. OF TEXAS. (No. 194–3249.)**

(Commission of Appeals of Texas, Section B. March 16, 1921.)

1. Insurance ⊜⇒335(3) — Antitechnicality law does not affect record warranty clause.

The antitechnicality law does not affect the record warranty clause in a fire policy.

2. Insurance ⊜⇒335(3) — Record books must reasonably afford data contracted for in fire policy.

Under a record warranty clause in a fire policy, the books themselves must reasonably and fairly afford the data contracted for, and resort cannot be had to extraneous sources for supplying this data in respect to matters essential to a substantial compliance.

**3. Insurance ☞335(3) — Books held insufficient under record warranty clause in fire policy.**

Where personal property, going into two buildings covered by two separate fire policies in separate amounts, was entered in insured's books in such a manner that the books themselves furnished no data from which it could be said that any of the property insured was covered by one or the other of the policies, there was no compliance by insured with the record warranty clause requiring a complete record of business transacted.

**4. Insurance ☞335(5) — Failure to comply with record warranty clause did not affect policy in so far as it insured building.**

Failure to comply with record warranty clause in a fire policy did not affect the validity of the policy in so far as it insured the building, although the policy provided that a noncompliance with such clause would render the entire policy null and void.

**5. Insurance ☞609—Underwriters held bound only for their proportion of loss as designated by policy.**

Several underwriters issuing fire policies substantially under the Lloyd's insurance system could only be held bound severally for their proportion of a loss as designated in the policy.

**6. Insurance ☞13—Fire insurance association could be sued in name of association.**

An association of underwriters issuing fire policies, in all respects substantially an arrangement under the Lloyd's insurance system as adopted in the United States, there being a trust fund administered by attorneys in fact, was such an association as is authorized to be sued in the name of the association under the statutes.

**7. Injunction ☞239—Attorneys in fact of insurance association, subscribing bond to obtain modification of temporary injunction, held bound to pay judgment.**

Where an association of underwriters was sued in the name of the association, and in order to secure a modification of a temporary injunction a bond was entered into in which the association and the attorneys in fact bound themselves as principals jointly and severally to satisfy any judgment which might be rendered, the attorneys in fact should be bound under their express obligation as principals to pay any judgment that might be rendered against the association.

Error to Court of Civil Appeals of Second Supreme Judicial District.

Suit by the Southern Trading Company of Texas against the Merchants' & Manufacturers' Lloyd's Insurance Exchange and others. From a judgment of the Court of Civil Appeals (205 S. W. 352), affirming a decree for plaintiff, defendants bring error. Judgments of district court and Court of Civil Appeals reversed, and cause remanded to former, with instructions to render judgment in favor of plaintiff.

E. H. Ratcliff and Bryan, Stone & Wade, all of Fort Worth, for plaintiffs in error.

Thos. H. Ball, of Houston, and Lockett & Rowe, of Fort Worth, for defendant in error.

McCLENDON, P. J. The Southern Trading Company of Texas recovered a joint and several judgment for $5,000 upon two policies of fire insurance against the "Merchants' & Manufacturers' Lloyd's Insurance Exchange" and I. H. Kempner and J. B. Cunningham as its attorneys in fact, and said Kempner and Cunningham as guarantors, and said Kempner and Cunningham and a large number of other persons and firms individually. This judgment was affirmed by the Court of Civil Appeals, one of the judges dissenting in part. 205 S. W. 352.

The errors assigned in the Supreme Court question the following holdings of the Court of Civil Appeals: First, that the act of April 2, 1913, known as the "Antitechnicality Law," is applicable to the record warranty clause of a fire insurance policy; second, that the evidence was sufficient to sustain a finding that plaintiff had substantially complied with that provision of the record warranty clause requiring the keeping of a set of books; third, that the defendants were under the policies sued upon liable jointly, or for a greater amount than their respective proportions as limited in the policies; and, fourth, that the defendants Kempner and Cunningham were liable for the full amount of the judgment, as guarantors, by reason of having executed a bond as a condition precedent to the modification of a temporary injunction.

The facts material to the questions presented are: The policies were both issued on the same day, one being for $1,500, apportioned $500 on a certain one-story building, and $1,000 on merchandise located therein, which consisted principally of steam and gasoline engines, pumps, and similar merchandise. The other policy was for $3,500, and on a similar stock of merchandise, contained in a two-story building about 15 feet distant from the one-story building. The policies were signed by Kempner and Cunningham as joint attorneys for each underwriter, the latter being 76 individuals and firms, who had subscribed to the association in various amounts from $1,000 to $21,000, in percentages ranging from ½ to 10½. The policies provide:

"That each of the individual underwriters hereto, as separate underwriters, each acting separately and not jointly, nor one for the other, nor for any of the others, each represented by and acting through" said Cunningham, "does hereby separately insure the Southern Trading Company of Texas" for the period named against all direct loss or damage by fire, except as otherwise provided, "to an amount not exceeding for each underwriter his pro rata portion of percentage as indicated by the rider attached, of the sum hereby insured."

The policies also provide that they are made and accepted subject, among other things, to powers of attorney to the undersigned attorneys by the underwriter, which powers of attorney are referred to and made a part of the policies. The policies also contained the standard record warranty clause, the portion of which pertinent to the issues in this case reads:

"The assured will make and prepare, in the regular course of business, from and after the date of this policy, a set of books, which shall clearly and plainly present a complete record of business transacted, including all purchases, sales and shipments, both for cash and on credit, or this entire policy shall be null and void.

"The term 'complete record of business transacted,' as used above, is meant to include in said set of books a complete record of all the property which shall go into the premises and be added to the stock and of all property taken from the stock, whether by the assured or by others, even though not technical purchases or technical sales."

Under the powers of attorney referred to, Kempner and Cunningham were designated as attorneys in fact for the several underwriters, with authority to execute policies of insurance, issue, change, modify, reinsure, or cancel contracts therefor, with such terms, warranties, and agreements as they might deem best, to collect premiums, adjust and settle losses, accept and waive proofs of losses, appear for the underwriters in suits or other proceedings, and bring, defend, prosecute, compromise, settle, or adjust same, and generally to represent the underwriters in all matters in connection with the contracts of insurance. The agreement was to become effective when the total subscriptions aggregated not less than 100 nor more than 1,000 units, and the required pro rata cash deposit of each unit had been made. Those units consisted of $1,000, to be represented by a cash deposit of $200 paid in, and to be maintained unimpaired at all times by each underwriter, and $800 in the form of a noninterest-bearing reserve note payable to a committee, provided for in the instrument, as trustee. Each underwriter was required to pay to the attorneys and committee for his individual account the $200 on each $1,000, and deposit his $800 note.

"The said cash and notes shall not be released or paid over to the underwriter in whole or in part so long as any insurance policy or claim of any character under the terms of this contract, remains an obligation outstanding against any such underwriter."

The attorneys were to make monthly statements to the committee, showing all business transacted, and a statement of the account of each individual underwriter, deducting from the premiums received the losses and expenses of each underwriter, and pay the balance to the committee for the account of such underwriter, less 10 per cent. of the gross premiums to be deducted as compensation to the attorneys for managing the business and guaranteeing the solvency of such underwriter and all parties at interest. On December 31st annually the committee and attorneys were to value the assets, deducting the necessary sum to cover losses and expenses known to have occurred and to pay outstanding liabilities of every kind, and pay the balance over to each underwriter after deducting attorneys' contingent compensation of 20 per cent. of the net profits. There were to be no joint funds, but a separate account was to be kept with each underwriter. Provision was made for an advisory committee to perform the services aforesaid. It was also provided as follows:

"In case any suit shall be brought against one or more of the underwriters on any policy thereunder, the citation shall be immediately delivered to the attorneys, and the attorneys shall have the power, and it shall be their duty to conduct the litigation, and they shall have power to settle or compromise any suit; when final judgment shall have been rendered against any one or more underwriters in any such suit, the committee and attorneys, or either of them shall pay, settle or compromise the liability of the remaining underwriters on any such policy without further litigation, according to the judgment obtained in any such suit as conclusive and as determining his liability whether he be a party to such suit or not."

With regard to the record warranty clause, it was shown by the testimony of the president and bookkeeper of the plaintiff that, while a complete set of books was kept, there was no separation of the business in the two buildings in which the merchandise covered by the two policies of insurance was kept, and it was impossible from the books to determine the articles placed in or taken from either of these buildings, the total only which went into both buildings being shown by the books. The testimony, however, was to the effect that the amount of loss exceeded the amount of recovery, which loss was arrived at by examination of the debris and taking into account such articles as were on the outside of the building and remained there after the fire. The evidence upon this phase of the case was without material controversy.

After the suit was filed, plaintiff obtained a temporary injunction, restraining the association and Kempner and Cunningham from paying out any property or funds of the association until they should file with the clerk of court a full statement, under oath, of the assets and business of the association. This injunction was modified so as to permit the association to continue its business without making the required statement, upon application of the association and the attorneys, which asserted under oath the solvency of the association and tendered a bond, approved by the clerk, for $7,500, conditioned that the association and Kempner and Cunning-

ham, jointly and severally, as principals, would discharge any judgment which might be rendered against them or either of them.

[1] While the several Courts of Civil Appeals have disagreed upon the application of the antitechnicality law to the record warranty clause, that question is now settled by the case of McPherson v. Camden Fire Insurance Co., 222 S. W. 211, in which it was held that the record warranty clause is not affected by this statute. See, also, Insurance Co. v. Levy, 222 S. W. 216, and Insurance Co. v. Waco Co., 222 S. W. 217.

[2, 3] We have reached the conclusion that the assignments of error questioning the sufficiency of the evidence as sustaining a finding that plaintiff substantially complied with the record warranty clause in the manner in which the books were kept should be sustained. While the same rule has been applied in the construction of policies of fire insurance as in other contracts, and only a substantial compliance with the provisions of the record warranty clause is required, still it has been the uniform holding of our Texas courts that the books themselves must reasonably and fairly afford the data contracted for; and that resort cannot be had to extraneous sources for supplying this data in respect to matters essential to a substantial compliance. While we have not found any case in Texas completely upon all fours with the present case, we believe that the application made of the foregoing principles in the adjudicated cases leaves no room for doubt as to the correctness of our conclusion. The purpose of the bookkeeping provision is to provide a means by the books themselves for ascertaining the amount of the loss. The insured binds himself to provide such means, and a clear violation of this provision of the contract carries with it its own consequences, which the courts have no power to alter. It certainly cannot be said that the books themselves comply either with the letter or the spirit of the bookkeeping clause, when they utterly fail to show what property went into or was taken from the premises which are designated in each policy as containing the entire subject of the insurance, in so far as the personal property insured is concerned. The books themselves did not even purport to supply this data. The personal property going into both buildings covered by the separate policies, and in separate amounts, was entered in the books in such a manner that the books themselves furnished no data from which it could be said that any of the property insured was covered by one or the other of the policies. It is therefore patent that the loss upon the personal property covered by either policy could not to any degree be ascertained from the books themselves. The following authorities are fairly illustrative of the application of the above rule:

In Rives v. Insurance Co. (Civ. App.) 77 S. W. 424, writ of error denied, books were kept in accordance with the policy, but were negligently burned. The insurance was upon cotton, and it was shown that the amount of cotton on hand could be definitely ascertained from books kept by other parties, who were interested with the insured in the cotton, but it was held as a matter of law that such extraneous data could not be resorted to to supply the requirement that the insured himself should keep and preserve the books.

In Monger v. Insurance Co., 97 Tex. 362, 79 S. W. 7, it was held that a failure to carry the cash sales of the business into the books avoided the policy, and that this data could not be supplied by slips from the cash register.

It has been held in several cases that the requirement to take and preserve an inventory was not substantially complied with by preserving and presenting to the insurer invoices covering the stock of goods insured. Assurance Co. v. Kemendo, 94 Tex. 369, 61 S. W. 1102; Association v. Masterson, 25 Tex. Civ. App. 518, 61 S. W. 962; Insurance Co. v. Walker (Civ. App.) 156 S. W. 1095. The holding in the last case was approved by the Commission of Appeals, 210 S. W. 682.

It has also been held in several cases that the failure to keep books as required by the policy renders the policy void, even though subsequently an inventory is taken and preserved, from which and subsequently kept books the amount of loss can be ascertained. Insurance Co. v. Okasaki (Civ. App.) 177 S. W. 200; Insurance Co. v. Cummings, 98 Tex. 115, 81 S. W. 705; Insurance Co. v. Caraway (Civ. App.) 130 S. W. 458; Insurance Co. v. Weeks Drug Co., 55 Tex. Civ. App. 263, 118 S. W. 1086; Insurance Co. v. Adams (Civ. App.) 158 S. W. 231; Insurance Co. v. Davis, 167 S. W. 175. We do not think further review of authorities necessary.

[4] The failure to comply with the record warranty clause, however, does not affect the smaller policy, in so far as it insures the building in the sum of $500; and that portion of the judgment should be permitted to stand, to the extent that the defendants may be held liable. This was expressly decided in Insurance Co. v. Kellner (Civ. App.) 169 S. W. 636, in which the court had under consideration a record warranty clause, providing that in case of its breach "this entire policy shall be null and void." Writ of error was refused in that case. This general subject is discussed in 2 Cooley's Brief on Insurance, p. 1894 et seq. The Texas cases bearing upon this subject are collated on pages 1900, 1901.

Regardless of the diverse holdings upon this question by courts of other states, the question should now be considered as conclusively settled in this jurisdiction, especially in view of the fact that the policies in this case were executed long after the decision in the Kellner Case was rendered.

[5] In determining the third question presented in the application, namely, the extent

of the liability of the several underwriters, we are of the view that liability should be measured by the terms of the contract itself. So far as we have been able to discover from our investigation, the association of the underwriters issuing the policies was in all respects substantially an arrangement under the Lloyd's insurance system, as that system has been adopted in the United States. 25 Cyc. 1524, note 1. It is there pointed out that the Lloyd's system is the oldest form of insurance known to our law. Under the English system, the underwriters subscribe to a fund which is entirely paid in, and which constitutes a trust fund to be administered by the attorneys in fact. The material difference between the English and American systems is that in the latter only a portion of the fund is paid in, and the balance contracted for. We have found no case which holds that under this form of insurance the underwriters are bound further than as expressed in the contract of insurance, which usually provides that the underwriters are bound severally, and not jointly, and only for their proportion of the loss as designated in the policy, or a rider attached thereto. In the absence of some statute prescribing a different rule, we see no reason why the common-law rule of holding the underwriters bound only as they have stipulated that they should be bound should prevail. The recently decided case of Sergeant v. Goldsmith, 221 S. W. 259, we think is directly in point upon this question. It is true that in that case the underwriters were engaged only in a mutual undertaking, and were held not to be partners, as they were not engaged in the business for profit. As to third persons, however, dealing with the representatives of the underwriters, who in that case were the policy holders, they were held to be liable as principals.

"As between themselves, they are liable as their contracts with each other make them liable. That is the whole of the case on the question presented."

We think it unnecessary to consider whether the underwriters in the present case were partners or merely principals, in so far as those dealing generally with their attorneys are concerned. In so far as they dealt with the plaintiff, they provided by contract the measure of their liability, and that liability should be so determined in the absence of some rule of public policy or statute law. We conclude that the underwriters are liable severally only, and only for their percentage of the entire loss as fixed by the policies. 1 Cooley's Brief on Insurance, p. 53; 4 Cooley's Brief on Insurance, p. 3072, and cases there cited; 25 Cyc. p. 1527, and cases cited in note 26.

[6, 7] We are of the opinion, however, that the judgment against the association and against Kempner and Cunningham, as guarantors jointly and severally for the full amount of the insurance upon the building in the smaller policy, should not be disturbed. We take this view independently of the fact that the liability of the association as such is not brought in question by any of the assignments of error. We think that whatever may be the nature of the liability of the underwriters, the undertaking was the creation of such an association as under our statutes is authorized to be sued in the name of the association. A fund was provided out of which all losses, including the loss in question, should be satisfied. In the proceedings for temporary injunction, the attorneys in fact stated under oath that the association was solvent, and amply able to pay the entire loss, and in order to secure a modification of the temporary injunction a bond in the sum of $7,500 was entered into, in which the association and the attorneys in fact bound themselves as principals, jointly and severally, to satisfy any judgment which might be rendered in the case against them, or either of them. The judgment against the association upon that portion of the smaller policy, held not to be invalid, should be permitted to stand; and we see no ground for holding that the attorneys in fact should not be bound, under their express obligation, as principals, to pay that judgment.

We conclude that the judgments of the district court and Court of Civil Appeals should be reversed, and the cause remanded to the former, with instructions to render judgment in favor of plaintiff against the Lloyd's Exchange and Kempner and Cunningham jointly and severally for $500, with legal interest from June 3, 1916, and against the individual defendants who were served severally, but not jointly, each for his percentage (as designated in the smaller policy) of said $500 and interest.

PHILLIPS, C. J. The judgment recommended in the report of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.