MABRY v. HARTFORD INS. CO. et al., and three other cases.—173 S. W. (2d) 169.

Western Section. October 30, 1941.

Petition for Certiorari denied by Supreme Court, February 7, 1942.

464

P. W. Maddox and W. H. Lassiter, both of Huntingdon, and J. R. Presson, of Hollow Rock, for appellant.

Pearson, Spragins & White, of Jackson, for appellees.

ANDERSON, J. The four bills filed in these consolidated causes are based on four policies of fire insurance

carried by the complainant on a stock of merchandise located in a store operated by him in Hollow Rock, Tennessee. The policies provided an aggregate indemnity of $7,800. The stock was damaged by fire that occurred on February 14, 1938, about 6:30 o'clock P. M. The bills charged "that said merchandise destroyed by fire was well worth the sum of $10,000.00 being far in excess of the value of all the insurance on said merchandise." After a trial according to the form of chancery, the chancellor dismissed the bill and complainant was granted a broad appeal. So far as necessary to be noticed, the defenses relied upon by the insurers are: (1) that the fire was of incendiary origin and was started either by complainant or by another with his aid, consent or connivance; and (2) that there had been a breach by the complainant of what is designated as the "Inventory-Iron Safe Clause" of his contracts. This provision, being the same in all of the policies, is as follows:

"Inventory-Iron Safe Clause: (Requirements to keep books and inventory). It is made a condition of this insurance: (1) That the insured under this policy shall take an inventory of the stock and other personal property hereby insured at least once every twelve months during the term of this policy, and unless such inventory has been taken within one year prior to the date of this policy, one shall be taken in detail within thirty (30) days thereafter; (2) that the insured shall keep a set of books showing a complete record of business transacted, including all purchases and sales both for cash and credit; (3) that the insured shall keep such books and inventory securely locked in a fireproof safe at night, and at all times when the store mentioned in the within policy is not actually open for business, or in some secure place

not exposed to a fire which would destroy the building where such business is carried on; (4) that in case of loss the insured shall produce such books and last inventory."

The chancellor found that "although the facts and circumstances leading up to this fire, the fire itself, the place of its origin, may be justly considered, to say the least of it, as suspicious and suggestive of something not entirely in keeping with honest loss," yet "the proof will not justify the Court in holding that this fire was of incendiary origin, started by someone with the aid, consent or connivance of the complainant."

The theory on which he dismissed the bill was that there had been no substantial compliance with what is, for convenience of expression, termed the "bookkeeping provision of the Inventory-Iron Safe Clause," to the effect "that the insured shall keep a set of books showing a complete record of business transacted, including all purchases and sales, both for cash and credit." The chancellor made no finding with respect to the contention of the insurers that there had been a failure to comply with the other provisions of the "Inventory-Iron Safe Clause."

The appeal having been a broad one, the insurers also have assigned errors by means of which they insist that the chancellor should have found, (1) that the fire had been set by the complainant or with his connivance, and (2) that he should have ruled that at the time of the fire the complainant's store was not actually open for business within the meaning of the inventory-iron safe clause, and that therefore the conceded fact that the last inventory taken by the complainant was lost or destroyed as a consequence of its not having been in a safe place re-

quired a ruling that there had been a breach of the pertinent provision of the inventory-iron safe clause.

In opposition to the first contention, the complainant insists that the origin of the fire was due to a defective wire or wires carrying electric current which lighted his store, and was purely accidental. With respect to the second contention, he insists that the recording agent who issued the policies well knew he did not have an iron safe and represented that it would be sufficient compliance if he carried his records home with him when the store was not open, but that upon this particular occasion the store was in fact open for business at the time of the fire within the meaning of the pertinent provision when properly construed and applied to the facts, and hence that clause was not applicable.

The specific point upon which the chancellor dismissed the bill seems to have been the failure of the insured to keep a record of the sales made out of the insured stock. In his challenge to the correctness of this ruling, the complainant contends that since he sold for cash only, the amount of goods sold during the period material to the inquiry could be readily ascertained by eliminating from his bank deposits as reflected by his bank book certain items representing money derived from other sources and reflected by other documentary evidence. He contends that when this is done and the amount of the sales are considered in connection with the aggregate of his last inventory plus the aggregate of invoices of goods purchased since the inventory was taken, the amount of the loss can be arrived at with the requisite degree of certainty, and hence that under the decisions in this State there was a substantial compliance with the "bookkeeping provision" of the "Inventory-Iron Safe Clause."

It is not necessary to take these several contentions up in the order stated. As we go along we shall dispose of all of them that it is necessary to consider.

As already stated, the fire occurred on February 14, 1938, about 6:30 o'clock P. M. The insured property consisted of the stock of dry goods and merchandise, together with the fixtures located in the store building on the north side of what is apparently the main street of the town of Hollow Rock. The complainant had been in business of that kind for many years. At the time of the fire, he owned a similar business in the nearby town of Camden, Tennessee. This business was conducted by the complainant's wife with the aid of a clerk, Henry Cavender. Both she and the clerk lived in Hollow Rock. From Hollow Rock to Camden is about 15 minutes drive by automobile, and Mrs. Mabry and Cavender went back and forth daily. The Hollow Rock business was conducted by the complainant with the aid of a clerk by the name of Lillian Crabbe, who lived with the complainant and his wife and worked in the store, apparently in return for her support by the complainant. Although both were owned by complainant, the store in Camden and the store in Hollow Rock were operated as separate concerns. The former was conducted under the name of Benton County Dry Goods Store and the latter apparently under the name, "O. J. Mabry." It is more convenient to refer to these as the "Camden Store" and the "Hollow Rock Store."

In December, 1937, an inventory of the stock at the Hollow Rock Store was taken, being completed on December 29th. It was made on the basis of the cost price and entered in a small book-shaped tablet with a pasteboard back of the kind known to school children as "com-

position books." The aggregate of the items on the inventory was $11,238.25. When completed, this total was also entered in what is designated by Miss Crabbe as a "ledger," although it obviously did not serve the purpose that a ledger usually serves in proper bookkeeping. This so-called ledger appears to have been opened upon the completion of the inventory on December 29, 1937, by the entry of the amount of the inventory and thereafter there was listed therein the amount of invoices covering goods received at both stores. This book was not introduced in evidence, the reason assigned being that it was currently in use, but the witness, Miss Crabbe, who testified she kept it, had it before her when her deposition was taken. Her testimony about it as well as that about other records kept by her is far from clear. If the book served any purpose other than that stated, we have been unable to discover it. Miss Crabbe testified that a similar book covering a period of two or three years had been destroyed in the fire, but she was altogether unable to describe it, with respect either to its color, the kind of binding it had, or whether it was of the type designated as loose-leaf, notwithstanding she said it had been in use for two or three years and she had kept it. She further testified, as did complainant's wife, that a record of the transfers of merchandise between the two stores was kept, and in support of their testimony in this respect, a similar "composition book" was introduced. We shall refer later to the testimony of the witnesses about this book. We can say now, however, that it, too, is far from satisfactory.

According to the testimony of the complainant, he had a small tin box in which he customarily kept his inventory, his bank book, his insurance policies, the so-called

"ledger," and the "composition book" containing a record of the transfers of merchandise between the two stores, as well as some current notes. The bank book, the transfer record, the "ledger" and the insurance policies were rescued by Miss Crabbe after the fire alarm had been given under circumstances shortly to be stated. She testified that she thought she gathered up the inventory at the same time she got the other papers and did not discover until the following morning that it was missing. At any rate, no such inventory was ever found. Its importance from the standpoint of the insurers will become apparent from what is to be hereinafter stated.

On the day of the fire, Mrs. Mabry and her clerk, Henry Cavender, arrived at the Hollow Rock store about 6 o'clock P. M., as was their custom. Shortly thereafter, Cavender left, going into the store operated by complainant's brother through a door connecting the two stores. Mrs. Mabry went to a store across the street to make a purchase. The girl, Lillian Crabbe got into a car for the purpose, according to her testimony, of moving it to a nearby filling station to have a tire put into the rear end. The complainant, upon leaving, took his seat on the sill of a window in a bank that adjoined his store. It was apparently Cavender's intention to go to his home and the intention of the complainant and his wife and Miss Crabbe to go to the Mabry home for supper. They all testified that they intended to come back to the store after supper to do a little work, as was their custom, and then go to a picture show in Camden. Upon leaving, the complainant bolted the back door to his store, and locked the front door, leaving two lights in the rear burning as was customary, and the door connecting his store with that of his brother open. This usually re-

mained open until the night watchman came on duty about 8 o'clock.

The complainant testified, as did Miss Crabbe, that they customarily came back after supper and did what was to be done in the store, and that during their absence the complainant's brother who had access to the complainant's store frequently sold merchandise out of the complainant's stock to customers appearing during the time that the complainant and his clerk were at supper. In this respect, he was corroborated by the brother. They all testified that it usually took from 20 to 30 minutes to eat supper. There is no explanation why, if it was really intended to keep the store open for business, that they both went to supper at the same time. In any event, while Mrs. Mabry was in the store across the street and Miss Crabbe was at the filling station nearby and complainant, according to his testimony, was still sitting on the window sill waiting for his wife and Miss Crabbe, someone called out that the interior of his store was on fire. The local fire department was soon upon the scene, as was the fire department from the town of Bruceton which is practically adjacent to the town of Hollow Rock. These fire fighting organizations turned their hoses upon the fire and soon thereafter succeeded in extinguishing the flames. Just how long this required is not shown in the record, but it could hardly have been long, for the building does not seem to have caught except at one point. This was in the ceiling made of pine, where a hole about 3 feet in length and 18 inches wide was burned. This hole was directly above a rack of dresses which stood near a stairway leading to a balcony that extended across the north end of the store. The dresses were hung in the rack on hangers and according to the deputy state

fire marshal and other witnesses offered by the insurers who examined the premises shortly after the fire, a portion of these dresses was the only part of the stock of merchandise that was burned completely, or, in the expressive language of the witnesses, the dresses or rather a part thereof, were the only merchandise that was "burned out of sight." These witnesses also testified that the physical circumstances were such as to give every indication that the fire started inside the store among these dresses, burning upward to the pine ceiling with the result stated.

In his proof of loss, the complainant stated that the origin of the fire was unknown. In his deposition he testified that it was due to a defective electric light wire in a light drop hanging from the ceiling. It was his view that the fire started in the attic on the upper part of the pine ceiling and burned through, and his testimony was to that effect. As stated, the testimony of the deputy fire marshal was to the contrary. The latter took out a part of the charred boards from the ceiling and testified concerning their appearance, but they were not filed in evidence. His testimony is to the effect that the smoked and charred area was on the under side of the ceiling extending from the hole outward and that no part of the upper side of the ceiling was smoked or charred, except of course the edges of the hole. In this he is supported by other witnesses of the defendant. The complainant and his witnesses testified precisely to the contrary—that is, that the burned and charred area extending outward from the hole was on the upper side of the ceiling and that there was no such area on the lower side facing the inside of the store.

Complainant testified that fully half his stock of merchandise was "burned out of sight." The insurers offered very plausible evidence to the effect that there was nothing to indicate, neither ashes nor anything else, that any very substantial part of the stock had been "burned out of sight."

According to the complainant's testimony, his cash sales during the period from the date of the last inventory to the date of the fire were practically offset by additions to the stock through purchases. In fact, according to a statement prepared and filed by Mrs. Mabry, the sales amounted to $564.50 and the additions to the stock amounted to $569.56. This being true, it is contended that from a dollars and cents standpoint, the stock on hand at the time of the fire was practically the same as it was at the time the inventory was taken; or, in other words, that it amounted to $11,243.31, figured on the basis of cost price. This contention obviously does not take into consideration the profit made on cash sales, but this is beside any point that we are examining. It is near enough for the purpose of the contrast that we are about to develop.

Shortly after the fire, the insurers employed the Underwriters Salvage Company of New York, a firm specializing in the examining, inventorying and disposing of stocks of merchandise damaged by fire and water. That company sent its Memphis representative, Mr. W. O. Cooper to the scene. Cooper, with the assistance of the complainant and Miss Crabbe, spent four days making a careful examination of the damaged stock with a view to reconstructing an inventory as of the date of the fire. Cooper's deposition was taken and he explained in detail his method of procedure. He testified that his inventory

consisted of 58 separate lots and was made on forms provided by his company for that specific purpose. These are filed in the record. He testified that, practically speaking, the entire stock was intact so far as making an inventory was concerned—that the only part of it that was "burned out of sight" consisted of the dresses that had been in the dress-rack and that he counted the hangers on which the dresses had hung and took the complainant's figures in arriving at the number of dresses in his reconstructed inventory. He also testified that the complainant and Miss Crabbe supplied all the prices and were with him throughout the time the inventory was being made. The total of his reconstructed inventory was $6,081.28. He was positive that only a small amount of the stock was "burned out of sight" so that it could not be inventoried, and he testified that "what we couldn't see and what the complainant couldn't recall did not exceed $600.00, or 10% of the total inventory;" that there was no area in the entire store in which all the merchandise was "burned out of sight" except part of the dresses on one rack.

While we are discussing this phase of the evidence, it is well enough to note that in a statement given in the course of an examination by a representative of the insurers, shortly after the fire, made pursuant to the provisions of the policy, the complainant stated that the difference between his inventory of December 29, 1937, amounting to $11,238.25, and the reconstructed inventory which he assisted Cooper in making, amounting to $6,081.28, was "stacked up in piles of ashes," and that his loss was "from $3,500 to $4,000 more than my policy." We should have stated that the damaged stock was afterwards sold for about $1,200. If the complainant be correct, then, under his theory, his loss amounted to

approximately $10,000, perhaps a little less, representing the difference between the inventory value of his stock and the salvage.

We have said enough to show just how important was the December, 1937, inventory, and a proper record of the sales of merchandise. It is obvious that under the defendants' theory there either was nothing like $11,000 worth of goods in the store at the time the inventory was taken, or the sales were far greater than the complainant claims they were. Moreover, the December, 1937, inventory, since it was itemized, would have been an invaluable aid in checking against the damaged stock for the purpose of ascertaining how much of each kind of merchandise had been "burned out of sight." The most significant fact about this phase of the controversy is the great difference between the testimony of the complainant and his witnesses and that offered by the defendants with respect to how much of the stock was absolutely destroyed so as to be unidentifiable, a difference which, we may say, it is utterly impossible to reconcile with the view that all of the witnesses testifying with respect to the pertinent facts were doing so in good faith.

The agent who wrote the insurance knew that the insured had no iron safe in which to put his records and he accordingly told him to take them home with him or put them in the bank. Complainant said that he had carried them home with him every night for many years. In fact, he testified that he never went anywhere without them; that he carried them with him to the picture show and to church.

So far as we are able to ascertain, these records consisted of those above referred to, namely, a so-called ledger, the inventory, the notes and the policies of insur-

ance. The complainant and Miss Crabbe said that these and a bank book were usually carried back and forth in a tin box. There seems to have been an office in or near the rear of the building and according to the complainant's testimony and that of Miss Crabbe the ''composition book'' containing the inventory and the notes and perhaps the ledger were lying, just prior to the fire, on the sill of the office window near the tin box in which they were usually kept. By way of explanation as to why the inventory was out of the box, the complainant testified that he used it frequently during each business day and that it had been in use of that particular day.

When the alarm was given, complainant rushed to the front door, unlocked it and entered the place. He was followed closely by Miss Crabbe. He testified that ''I told her to get the box and all the papers and thought she had done so until it was discovered the following morning that the inventories, both that taken in December and one that had been taken in the previous August, were missing,'' as were also the ''ledger'' that had been in use, according to Miss Crabbe, for two or three years prior to the time the new one was opened on December 29, 1937, and the notes hereinabove referred to.

Miss Crabbe testified that when she went in the store ''I got the box and ledger and I thought I had all the important papers,'' including the last inventory; that she had seen the inventory on that afternoon and thought she got it along with the other papers until the next day when it was found to be missing. Complainant and Miss Crabbe made a search for the inventory after the fire was over and were unable to find either it or the old ledger or the notes. All of these were in the office in or about the desk or in the window sill. According to other

witnesses, there were a number of unburned papers on the floor of the office and in the drawer of the desk was found a paper-back book hereinabove referred to as containing a record of the goods exchanged between the two stores, and also all of the invoices except two covering goods received after the last inventory had been taken. Nothing in the office had been burned. The partition walls had been blistered, as had the top of the desk, but the damage to the latter had evidently been slight because it was continued in use after being sandpapered and revarnished.

■ As to the defense based upon the origin of the fire, it is sufficient to say that while the circumstances were suspicious, we agree with the chancellor that they do not have the probative strength to warrant the conclusion that that defense should be sustained.

It is appropriate to next undertake a further description of the records kept at the Hollow Rock store, referring incidentally to those covering the operations of the Camden store. The latter, such as they were, were kept by Mrs. Mabry. Proceeds of the Camden business were deposited in the Commerce Union Bank at that place and remitted from time to time to the complainant by means of checks drawn by Mrs. Mabry. At least this was the means used upon some occasions. Goods purchased from wholesalers intended for the Camden store were shipped to and delivered at that point. The invoices were in the name of the "Benton County Dry Goods Store," but were sent to the complainant at Hollow Rock and the amount thereof or the goods represented thereby were, to use the phrase of the complainant's witness, Miss Crabbe, "billed out" to the Camden store. Just what is meant by the quoted phrase is not clear. Almost

every day goods were taken from the stock in the Hollow Rock store and carried by Mrs. Mabry to the Camden store and occasionally, or at least less frequently, she brought merchandise from the stock at Camden and placed it in the store at Hollow Rock.

Miss Crabbe did all of the bookkeeping that was done in the Hollow Rock store.

There was introduced in evidence as an exhibit to Mrs. Mabry's deposition a book-shaped tablet or "composition book," which, according to the testimony of Mrs. Mabry and Miss Crabbe, contains a record of the transfer of merchandise between the two stores. This book seems to have been in a drawer in a desk in the office of the Hollow Rock store and was apparently discovered after the fire, not having met the fate of the inventory. The testimony concerning it is even more confusing than that concerning the other records. Miss Crabbe said that she made all the entries in the book and that it contains a record of goods exchanged between the two stores. It is in fact a rather vague record of additions from all sources to the stock in the Camden store covering the period from July 23, 1937, to February 11, 1938, together with occasional entries designated "Cash" and "Expenses," the total of which items being deducted each month from the total of the items reflecting additions to stock, the balance then being drawn down, and designated as "stock of goods on hand" as of the date of the entry. Some of these entries reflecting additions to stock give what is apparently the source of such items, as, for instance, on August 29th there is an entry reading: "To bill of goods, J. S. Reaves & Co., $88.20." This is followed by a number of entries of the same kind with the exception that the name, L. Jonas appears instead

of J. S. Reaves & Company. Most of the entries, however, fail altogether to reflect the source from which came the goods represented by the entry, and, as we say, this record even with the aid of oral testimony cannot be regarded as a satisfactory record of the goods sent from the Hollow Rock store to the Camden store, or vice versa.

No record was kept of goods sold on the credit and the complainant has presented the case upon the theory that there were no such sales. This theory has no convincing factual basis. True, Miss Crabbe testified that nothing was sold on the credit at the Hollow Rock store; that upon the contrary all sales were for cash. But the complainant himself does not bear her out in this, for, on his direct examination, in response to the inquiry of his own solicitor, ''Do you all sell any merchandise on credit?,'' he responded, ''Not to amount to anything at all,'' which was, of course, tantamount to an admission that some such sales were in fact made.

But this is not all. Upon his cross-examination, he testified to having lost several notes in the fire. These notes, he said, had been given for merchandise which he had sold several years back, having been renewed from time to time. He did not say just how many there were, but presumably there were a number of them, because, by way of explanation of the fact that at the time of the fire they were not all in the box where they were customarily kept, he testified, ''We had been running lists of the notes.'' He also said that he ''collected a little bit along every year on these notes, but that he had no record of them or what they represented other than the notes themselves.''

The complainant's witness, Buford Williams, testified that he was a patron of the Hollow Rock store and that

at the time his deposition was taken as well as before the fire he had "a charge account" with the complainant.

No record of any kind of daily cash sales was kept. In lieu thereof complainant relied upon his bank pass book, respecting deposits made at intervals. He admitted that funds from other sources were mingled with the proceeds of cash sales, the whole being deposited from time to time in lump sums with nothing on the deposit slip, the pass book, or the bank's record to indicate how much of each deposit represented the proceeds of cash sales of merchandise, and how much was from other sources.

The pass book was not introduced in evidence by the defendant and the amount of each deposit during the period from the taking of the last inventory to the date of the fire was read into the record by Miss Crabbe. In addition, Mrs. Mabry, who had nothing to do with the making up of the deposits, had prepared a statement on which she undertook to show what amount in each deposit represented receipts from sources other than the sale of merchandise, and by subtracting such amount from the total of the deposit arrived at the amount of cash sales. This list was filed as an exhibit to Mrs. Mabry's deposition. It shows that deposits were not made every day. It also shows that between December 30, 1937, and February 14, 1938, the date of the fire, an aggregate amount of $3,814 was deposited. Of this amount, according to Mrs. Mabry's statement, $3,249.50 was derived from other sources, and, as stated, by taking this amount from the total deposit, she arrived at the total sales during the period mentioned, of $564.50. She testified that collections from sources other than cash sales represented the amounts paid on various notes and amounts re-

mitted by her to the complainant from the proceeds of the Camden business, and the proceeds of loans from banks. In support of her testimony upon this point, she filed in connection with the statement, a number of cancelled checks and three notes payable to the complainant, two executed by his brother, C. L. Mabry, and one by a nephew, Alvis Mabry, Mrs. Alvis Mabry and C. L. Mabry. In the same connection, she filed a written statement signed by the cashier of the Bank of Hollow Rock, who was not examined as a witness, purporting to contain a list of notes purchased by the bank from the complainant, and loans made directly to him, by the bank, between January 1, 1938, and February 15, 1938, and also a written statement signed by the vice-president of the Commerce Union Bank, addressed "To Whom it May Concern:" to the effect that, "This is to say that this bank did lend $2,000.00 to Mr. O. J. Mabry on January 3, 1938." This official was not examined as a witness, nor were any of the bank records introduced, nor was it explained how the complainant came to be in possession of the notes that apparently had been paid and presumably delivered to the makers.

As before stated, the complainant contends that the records we have described show a substantial compliance with the bookkeeping provision of the iron safe clause, and that under the authorities in this State, this is all that was necessary and the chancellor should have so held. This contention is unsound.

 With reference to the purpose of a policy provision such as that under consideration, the Supreme Court, in the leading case of Hughes Bros. v. Ætna Ins. Co., 148 Tenn. 293, 255 S. W. 363, 365, a case involving a

situation very similar in its material aspects to that involved in the case at bar, had this to say:

"Such a clause is necessary in a contract of insurance on a fluctuating stock to protect the insurer against the fallability or dishonesty of the insured. Such records, showing the amount and value of goods acquired and the amount and value of goods sold, enable the insurer to tell with approximate accuracy, the amount and value of goods on hand at the time of the loss. Without such records the insurer has no protection whatever against false or partial estimates of the insured and his friends. The amount of the loss becomes a question of guesswork, and the answer often depends on the testimony of biased witnesses.

. . . . . . .

"A substantial compliance with this provision must be exacted. Expert bookkeeping is not required, but it is competent to require the keeping of such books as will fairly show to a man of ordinary intelligence all purchases and all sales both for cash and credit, and it is competent to require an effort, at least, to keep such books in a safe place. McNutt v. Virginia F. & M. Ins. Co. [Tenn. Ch. App., 45 S. W. 61], supra; Liverpool etc., Ins. Co. v. Kearney, 180 U. S. 132, 21 S. Ct. 326, 45 L. Ed. 460, and authorities cited above."

In that case, as here, there was an effort by the insured to show the amount of their cash sales by a record of their bank deposits, but this was held inadmissible for, said the Court, "their own testimony shows that the bank deposits did not correspond with their cash sales," and "deposits were made from other sources." Upon that phase of the case the Court concluded that "there was not reasonable or substantial compliance with the

terms of the iron safe clause." "No books whatever," the Court continued, "were kept showing cash sales and no record of credit sales was kept in a safe place, nor any attempt made to do so. Stock on hand could only be shown by the estimates of the insured and their friends and neighbors."

Now, it seems to us that the ruling in that case is a complete answer to the determinative question in this case as it arises upon the conceded facts with respect to the breach of the bookkeeping provision of the iron safe clause. As we have already said, there was no record whatever kept of the credit sales, nor was there any attempt to show even by oral testimony what such sales amounted to. True, Miss Crabbe testified that they made no sales on credit, but had a cash business only. But for the reasons already stated we decline to accept her testimony on this point.

Again, the complainant testified that he collected from time to time sums on the notes that had been given for merchandise sold by him of which no record whatever was made; nor was it shown to what extent such collections were reflected by the bank deposits. In brief, there is no way to tell, either from records or from oral testimony, for that matter, the amount of goods that was sold on credit during the period between the making of the last inventory and the fire.

It is equally clear that under the ruling in the Hughes Bros. case the record of cash deposited in the bank at Hollow Rock, contained in the pass-book, does not fulfill the policy requirement with respect to keeping a record of cash sales. As we have said, neither the deposit slips, the bank record nor the pass-book was introduced but the testimony of Miss Crabbe, who actually made up the

deposits and delivered them to the bank, is to the effect that neither of these records disclosed the source or sources of the sums so deposited. In other words, it manifestly was impossible to tell from an examination of all the records appertaining to the deposits what amount thereof represented the proceeds from cash sales made in the prosecution of the complainant's business.

It is not permissible to supply this omission by a resort to extrinsic evidence of the kinds offered here, and this is true notwithstanding the efforts to support the oral testimony relating thereto by the various instruments hereinabove mentioned. In its relation to the bank deposits this documentary evidence is worthless from a probative standpoint without the illumination furnished by the oral testimony of the witnesses; for the instruments contain nothing to indicate that the amounts represented thereby or any part thereof are included in any of the deposits reflected by the pass-book. This essential fact appears only from the testimony of the witnesses and if it should be held permissible to supply by oral testimony part of the facts essential to the ascertainment of the amount of cash sales there could be no sound reason for holding it impermissible to so supply all of the facts essential thereto, and thus read out the bookkeeping requirement of the policies altogether.

But there is another fatal weakness in the effort to show a substantial compliance with the bookkeeping provision by resort to the record of bank deposits. This lies in the fact that there is no evidence at all, documentary or otherwise, with respect to what part of the bank deposits represented collections on accounts or notes. We have already adverted to the testimony to the effect that there were at least some sales made on

the credit, and it is of course reasonable to infer that this being true there were collections on account. But it is not necessary to resort to an inference with reference to collections on notes, for, as we have already pointed out, the complainant testified that collections were made on these from time to time. As stated, it is not shown just how many notes of this kind the complainant had, but that they were not inconsiderable either in number or in amount is clearly to be inferred from the complainant's testimony explaining why they were not in their usual place in the tin box, i. e., that on the very day of the fire "we had been running a list of the notes."

■■ We think the complainant has the wrong conception of what is meant by a substantial compliance with the bookkeeping provision of the iron safe clause as established by the authorities in this State. It is not a question of the probative value of the evidence introduced on the trial bearing upon the amount of the sales made for cash during the period in question, as the complainant seems to think; but rather a question of whether prior to the loss there was a substantial compliance with the policy requirement with respect to the keeping of the record of such a sales. Even where the witnesses testify with absolute verity as to the amount of cash sales made so as to leave no doubt about the matter, yet if there were no record made of such sales, there is no compliance with the policy requirement. So, in the present case, if we accept as correct the amount of the cash sales arrived at by the process resorted to, that is, by eliminating from the bank deposits by means of extrinsic evidence all amounts other than cash sales, still the complainant would fail because no record was kept by the insured which fairly showed all sales for both cash and credit.

486

■ While expert bookkeeping is not required, the policy provision contemplates a written record that having been identified is fairly self-interpretative to one of ordinary intelligence. The information expected to be shown by such a record cannot be supplied in a test of liability by the introduction of extrinsic evidence both retrospective and of an oral nature, even though it truly reflect the facts which the written record would have shown, had one been kept in the required manner.

Although, as we say, it is not a question of the verity of the result arrived at by the process resorted to, we are disposed to point out one weakness in the complainant's evidence on this point by way of illustrating the wisdom of the policy requirement and the soundness of the rule construing it in the manner stated. Between December 30, 1937, and February 14, 1938, there seem to have been 29 separate deposits made ranging in amount from $15.00 to $1,000 and aggregating $3,814. Every single one of these deposits was for an even amount of dollars—that is, there were no odd cents in any of them. Now if, as the complainant would have us believe, all of the proceeds from cash sales were included, the chances against all of the deposits from such sources being for an even number of dollars with no odd cents, are so overwhelming, according to common knowledge of such matters, as to be out of the question as a practical matter, even though possible theoretically.

■ Again, we think there was no substantial compliance with the bookkeeping clause of the policies with respect to the goods transferred from the Hollow Rock store to the Camden store. Although not sales in the ordinary sense of the word, we have no doubt that these transactions were within the purview of that policy pro-

vision. See Merchants, etc., Ins. Exchange v. Southern Trading Co., Tex. Com. App., 229 S. W. 312; Governale v. Interstate Fire Ins. Co., 141 La. 133, 74 So. 791.

Considering the confused state of the testimony with respect thereto, we have described this record as best we could. We need not elaborate upon it further than to say that even with the testimony of Mrs. Mabry and Miss Crabbe concerning it, we find it difficult to conclude that it was in reality intended to be a contemporaneous record of those transactions. Without that testimony, that alleged fact would not even be suspected.

In support of his contention that there was a substantial compliance with the bookkeeping clause, the complainant refers us to the case of Cates v. Fidelity-Phoenix Ins. Co., 7 Tenn. App. 513. But it is clear that the decision in that case does not help him any. The ruling there made was that there had been a substantial compliance with the bookkeeping provision of the iron safe clause in that the insured had kept three books, namely, (1) a ledger on which was entered all credit sales, an itemized copy of his last inventory, and all wholesale accounts showing merchandise purchased and the price thereof; (2) a cash book showing the amount of each day's cash sales; and (3) a ledger in the form of an account book reflecting the status of the accounts of various customers to whom goods had been sold on credit by showing thereon not only the items sold but also payments made on account. From what has been said above, it is needless to argue the point that there is no such showing made in the instant case. It is not even contended by the complainant that any such records were kept by him. The fact that the records in the Cates case were destroyed by the fire is beside the point. The failure

to have them in a safe place was apparently excused for the reasons set out in the opinion. We are not here concerned with that phase of the rule there followed. The determinative distinction between that case and the one at bar is this: In the former, sufficient records were actually kept but not preserved (a question with which we are not concerned at the moment), whereas in the present case, under the conceded facts, such records were not only not preserved but they were not kept in the first place.

The complainant also relies upon the case of Taylor v. Globe & Rutgers Fire Ins. Co. et al., 14 Tenn. App. 538. As was true of the Cates case, that one is distinguishable upon its facts from the case at bar. There it appeared that the insured had in his safe three books which contained a record of the last inventory, a record of the invoices of goods subsequently purchased, and a list of credit sales during the period involved. The difference was that the insured had not also kept a book account of his cash sales. In lieu thereof he offered a bank record reflecting his daily deposits which was held to be a substantial compliance with the policy requirement with respect to keeping a record of cash sales because it was shown "that the insured regularly deposited the cash derived from the cash sales in bank, and the statement reflects the value of the stock reduced to cash." The distinction between that case and this case is that there the bank record accurately reflected the amount of cash sales without the necessity of resorting to extrinsic evidence in order to arrive at that essential fact, whereas here, other questions aside, it is conceded that that information cannot be derived from the bank records without the aid of extrinsic evidence interpreted by oral testimony.

The case of Maden v. Home Ins. Co., 9 Tenn. App. 329, is not in point upon the question we are now considering. It involved only the failure to produce the required inventory.

The defendants refer us to the case of Lynn Point Mercantile Co. v. United States Ins. Co. of New York et al., from the Law Docket of Gibson County, decided by the Court of Civil Appeals in a memorandum opinion filed March 7, 1925. It is unnecessary to discuss that case further than to say that upon a somewhat similar state of facts the Court reached the same conclusion that we have reached with respect to an effort to use a record of bank deposits in lieu of a record of cash sales, it appearing that resort to oral testimony was necessary to interpret said deposits in order to arrive at the facts sought.

We have not discussed the authorities from other jurisdictions to which we have been referred, for the case of Hughes Bros. v. Ætna Ins. Co. has all of the law that is necessary to dispose of the determinative questions. Any one desiring to pursue further the legal aspects of the matter will find convenient the reference to the cases in the notes appearing in 39 A. L. R. 1443 et seq.; 62 A. L. R. 630 et seq.; and 125 A. L. R. 350 et seq. Couch, Cyclopedia of Insurance Law, secs. 1032-1032a, deal with the same questions.

This leaves only the defendants' assignment of error to the effect that the Chancellor should have ruled that at the time of the fire, the complainant's store was not actually open for business and hence the fact that the inventory was not in a safe place not exposed to a fire which would destroy the building in which the business was carried on, amounted to a breach of the other pro-

visions of the inventory-iron safe clause.. We have here-inabove stated the facts bearing upon this phase of the case and think they present a rather close question. But we also think it is not one we are called upon to decide for the reason that we have decided enough already to dispose of the whole controversy, and this being so, nothing more is necessary.

The result is that the decree is affirmed at the cost of the complainant.

Senter and Ketchum, JJ., concur.